Sullivan CLARK, III, Respondent,

v.

DIRECTOR OF REVENUE, Appellant.

No. 25732.

Missouri Court of Appeals,
Southern District,
Division One.

April 22, 2004.

Jeremiah W. (Jay) Nixon, Atty. Gen., and Robert J. (Jeff) Bartholomew, Jefferson City, for Appellant.

Phillip J. Barkett, Jr., Cook, Barkett, Magure & Ponder, L.C., Cape Girardeau, for Respondent.

ROBERT S. BARNEY, Presiding Judge.

Appellant Director of Revenue ("Director") appeals the trial court's judgment setting aside the suspension of the driving privileges of Respondent Sullivan Clark, III ("Driver"). In the sole point on appeal, Director maintains the trial court's judgment was unsupported by substantial evidence and was against the weight of the evidence, in that Director established a *prima facie* case for suspension of Driver's driving privileges and Driver failed to rebut Director's *prima facie* case at a bench trial held on Driver's petition for trial de novo pursuant to § 302.535.[1]

As reflected in the records submitted by Director at trial, at approximately 11:50 p.m. on July 6, 2001, Driver was involved in a one-vehicle accident. Missouri Highway Patrolman S.R. Rowe ("Trooper Rowe") arrived on the scene of the accident shortly after midnight on July 7, 2001. Trooper Rowe noted the moderate odor of intoxicants on Driver's breath and that Driver's speech was slurred. Trooper Rowe also observed that Driver's eyes were bloodshot and glassy and that his pupils were dilated. Driver told Trooper Rowe that he had "had a couple of beers." Another Missouri Highway Patrolman interviewed two witnesses who stated they observed Driver's vehicle "swerving all over the road" immediately prior to the accident.

Trooper Rowe administered several field sobriety tests. Driver was instructed to repeat the alphabet from C through Q, but Driver recited the entire alphabet. Driver was also asked to count backwards from 90 through 78, which he was unable to do properly. Trooper Rowe performed a Gaze Nystagmus test, which also indicated, in Trooper Rowe's opinion, that Driver was intoxicated. Based on his observations and Driver's performance on the field sobriety tests, Trooper Rowe placed Driver under arrest for Operating a Motor Vehicle While in an Intoxicated Condition and Failure to Wear a Seatbelt.

Driver was taken by ambulance to a hospital in Sikeston, Missouri. After a medical evaluation, Driver consented to a blood test. Trooper Rowe completed a Voluntary Implied Consent Request at 1:20 a.m., which requested that the Missouri Delta Medical Center withdraw blood from Driver for the blood test. Trooper Rowe then witnessed Registered Nurse Melindi Abner collect the blood sample. Trooper Rowe mailed the blood sample via certified mail to the crime laboratory in Willow Springs, Missouri for analysis. The blood sample was received and tested by Criminalist/Chemist Scott Workman ("Workman"), who determined that the ethyl alcohol content of the blood was 0.141 percent.

On October 23, 2001, the Department of Revenue issued a notice to Driver that his driving privileges were suspended pursuant to § 302.505.1.[2] On November 1, 2001,

---

1. All statutory references are to RSMo 2000, unless otherwise stated.

2. At the time of Driver's arrest, section 302.505 provided, in pertinent part that:

1. The department shall suspend or revoke the license of any person upon its determination that the person was arrested upon probable cause to believe such person was driving a motor vehicle while the alcohol

in the Circuit Court of Mississippi County, Driver filed a Petition for Trial De Novo of the administrative suspension of his driving privileges together with a Motion for the Issuance of a Restricted Driving Privilege.

At the trial de novo Director presented the certified records previously mentioned and the testimony of Workman in proving up her case. Driver did not present any witnesses and limited his case to the cross-examination of Workman.

The trial court entered judgment on June 10, 2003, finding in part that Workman's testimony was "unreliable, and therefore not credible." The court concluded that because the blood alcohol test results in the records submitted by Director were "but derivative of the work and testimony of [Workman], those results must likewise be disregarded." In so finding, the trial court set aside the administrative alcohol suspension of Driver's driving privileges. This appeal followed.

▮▮▮ "This Court will affirm the trial court's judgment unless there is no substantial evidence to support it, unless the decision is contrary to the weight of the evidence, or unless the trial court erroneously declares or applies the law." *Verdoorn v. Director of Revenue,* 119 S.W.3d 543, 545 (Mo. banc 2003).[3] We defer to the trial court's determinations regarding credibility. *Id.* However, when the evidence supporting revocation is "uncontroverted or admitted so that the real issue is a legal one as to the legal effect of the

evidence, then there is no need to defer to the trial court's judgment." *Id.*

▮▮▮ Pursuant to section 302.535.1, RSMo 2000, Director had the burden of establishing a *prima facie* case for suspension of a driver's license by presenting evidence that at the time of the arrest: (1) there was probable cause for arresting Driver for driving under the influence; and (2) that the alcohol concentration in Driver's blood was .10 percent or more. *Id.* "The 'burden of proof' is on the director of revenue to establish grounds for the suspension or revocation by a preponderance of the evidence." *Id.* (quoting § 302.535.1). When the director makes a *prima facie* case, the evidence "creates a presumption that the driver was intoxicated." *Id.* "The driver is then entitled to rebut the director's *prima facie* case with evidence that his blood alcohol content did not exceed the legal limit." *Id.* The rebuttal evidence should raise "a genuine issue of fact regarding the validity of the blood alcohol test results" and "should challenge the presumption of validity established by the director's *prima facie* case...." *Id.* at 546.

▮▮▮ As to the first element of Director's *prima facie* case, the uncontroverted evidence established that Trooper Rowe had probable cause to believe Driver had been driving while intoxicated. As previously related, Trooper Rowe noticed a moderate odor of intoxicants on Driver's breath, Driver's speech was slurred, Driver's eyes

concentration in the person's blood, breath, or urine was ten-hundredths of one percent or more by weight....

This sub-section was amended to reduce the legal limit to .08 percent of alcohol concentration in the blood and took effect September 29, 2001. § 302.505.1, RSMo Cum.Supp. 2002.

**3.** Only to the extent that they misstate the evidentiary rebuttal standards, *Verdoorn* over-

ruled the following cases cited in this opinion: *Francis v. Director of Revenue,* 85 S.W.3d 56 (Mo.App.2002); *Phelps v. Director of Revenue,* 47 S.W.3d 395 (Mo.App.2001); *Riggin v. Director of Revenue,* 25 S.W.3d 695 (Mo.App. 2000); *Hurley v. Director of Revenue,* 982 S.W.2d 694 (Mo.App.1998); *Green v. Director of Revenue,* 961 S.W.2d 936 (Mo.App.1998).

were bloodshot and glassy, and Driver's pupils were dilated. Driver admitted that he had "had a couple of beers." Driver performed three field sobriety tests and, in Trooper Rowe's opinion, Driver failed all three of them. Finally, two witnesses stated they observed Driver's vehicle "swerving all over the road" immediately prior to the accident. We find this evidence was sufficient to support a finding that Trooper Rowe had probable cause to arrest Driver.

We now consider the second element of Director's *prima facie* case—whether Driver's blood alcohol content ("BAC") was .10 percent or more. Director initially introduced Exhibit A, a copy of the Department of Revenue records including the affidavit of the custodian of records for the Department of Revenue, DWI Division; the complaint and summons; the Alcohol Influence Report; the forensic laboratory report; the accident report; and Driver's "Missouri Driver Record." The Alcohol Influence Report and the forensic laboratory report both identified the test result from the chemical analysis of Driver's blood sample, which indicated a BAC of 0.141 percent.

■ When using a blood test to prove BAC, the proponent of the test must usually meet all foundational prerequisites for its admission. The required prerequisites are: (1) that the individual who took the blood sample was a licensed physician, registered nurse, or trained medical technician; (2) that a sterile needle was used; (3) that a sterile container was used; and (4) that a non-alcoholic antiseptic was used. § 577.029; *see also Francis v. Director of Revenue,* 85 S.W.3d 56, 59–60 (Mo.App. 2002); *Nesbitt v. Director of Revenue,* 982 S.W.2d 783, 784–85 (Mo.App.1998).

At the trial de novo, Director submitted the records as business records pursuant to section 490.692. The statute provides, in pertinent part:

> 1. Any records or copies of records reproduced in the ordinary course of business ... *shall be* admissible as a business record, subject to other substantive or procedural objections, in any court in this state upon the affidavit of the person who would otherwise provide the prerequisites of sections 490.660 to 490.690, that the records attached to the affidavit were kept as required by section 490.680.

§ 490.692 (emphasis added). Director included in the proffered records an affidavit from Doris M. Hooks, the custodian of records for the Missouri Department of Revenue, DWI Division. This certification included the following language: "It is further certified pursuant to Section 302.312 RSMo., that the records attached hereto are exact duplicates of the original records lawfully filed or deposited with the Department of Revenue by the reporting agency or entity pursuant to the provisions of Chapters 302, 303 and/or 577 RSMo."

■ Furthermore, section 302.312 provides, in pertinent part:

> 1. Copies of all papers, documents, and records lawfully deposited or filed in the offices of the department of revenue or the bureau of vital records of the department of health and copies of any records, properly certified by the appropriate custodian or the director, *shall be admissible as evidence in all courts of this state and in all administrative proceedings.*

(Emphasis added.) "The language of Section 302.312 ... is clear and unambiguous. Copies of documents from the department of revenue are admissible as evidence so long as the copies are properly certified." *Mills v. Director of Revenue,* 964 S.W.2d 873, 875 (Mo.App.1998); *see also Riggin v. Director of Revenue,* 25 S.W.3d 695, 698

(Mo.App.2000). Accordingly, Director's records included in Exhibit A were properly certified and admissible as an exception to the hearsay rule, *see Francis*, 85 S.W.3d at 60, and this Court reviews the evidence in this case in light of this statutory mandate.

During direct examination, Director asked Workman what the results were from the tests he conducted. At this point, Driver objected "because there [had not] been a sufficient chain of custody established to identify where this blood came from." The trial court overruled the objection. Driver then stated, "The objection is insufficient foundation," which the court indicated again was overruled. After Workman had completed his testimony on direct examination, Director offered the forensic laboratory report into evidence. Driver stated, "I want to make the same objection to [the forensic laboratory report] that I made to his testimony, that there's insufficient foundation, principally because there's lack—no showing of chain of custody of the blood sample from [Driver] to [Workman]." The court overruled the objection.

■ Driver's objections did not allege that Director had not provided an adequate foundation for the admission of the records and the forensic laboratory results in so far as the four prerequisites, previously mentioned, were concerned. Rather, his objection centered on the chain of custody of the blood sample from when it was extracted to when Workman received it. Because Driver did not object on the grounds that the sample was taken or the tests were performed incorrectly, Driver waives any argument that the test was not performed according to the approved techniques and methods of the Department of Health. *Phelps v. Director of Revenue*, 47 S.W.3d 395, 401 (Mo.App.2001).

The Alcohol Influence Report included a statement from the individual who drew the blood revealing she was a registered nurse, that a sterile needle was used, that a sterile container was used, and that a non-alcoholic antiseptic was used. Further, Director's witness, Workman, testified that he followed all the Department of Health regulations in performing the analysis.

Based on the uncontroverted evidence regarding probable cause and the blood test results admitted into evidence, Director established the elements of a *prima facie* case for driving while intoxicated. *Verdoorn*, 119 S.W.3d at 546. We now turn to a determination as to whether Driver presented rebuttal evidence that raised "a genuine issue of fact regarding the validity of the blood alcohol test results." *Id.*

As previously set out, Driver presented no evidence and limited his argument to a cross-examination of Workman. In relevant part, Driver asked Workman numerous questions about his "personal knowledge" of the blood sample. Workman testified that he had not seen the blood drawn from Driver; did not know the manner the blood was drawn; did not know if a sterile needle was used; did not know if a non-alcoholic antiseptic was used; and did not know who drew the blood sample or if they were medically qualified to do so. Workman further acknowledged that while he knew Driver's BAC at the time the blood sample was taken, he did not know with any scientific certainty what Driver's BAC was at the time he was driving.

While we defer to the determination of the trial court as to credibility of witnesses, *Id.* at 545; *Hinnah v. Director of Revenue*, 77 S.W.3d 616, 620 (Mo. banc 2002), if the evidence is uncontroverted, there is no need for such deference. *Hin-*

*nah,* 77 S.W.3d at 620; *see also Bucher v. Director of Revenue,* 98 S.W.3d 79, 83 (Mo.App.2003).

■ When a driver attempts to rebut the director's *prima facie* case solely through cross-examination, "it is insufficient to merely point out 'inconsistencies' that do not effectively rebut a material element of Director's case." *Phelps,* 47 S.W.3d at 402 (quoting *Hurley v. Director of Revenue,* 982 S.W.2d 694, 697 (Mo.App. 1998)). Rather, "cross-examination must at a minimum create a legitimate credibility dilemma with respect to a material aspect of Director's case." *Id.*

■ In the instant case, Driver presented no evidence that contradicted the records submitted by Director showing that Driver's blood sample was either improperly drawn or that the blood test performed by Workman was deficient in some manner. The questions regarding Workman's "personal knowledge" of the manner in which the blood was drawn and by whom are not relevant to the means by which the blood test was performed by Workman. Whether Workman witnessed the blood being drawn does not influence the results of the blood test that he testified to on direct examination. As such, that portion of Driver's cross-examination was insufficient to create a legitimate credibility dilemma with respect to a material aspect of Director's case or to rebut Director's *prima facie* case. *See id.; see also Green v. Director of Revenue,* 961 S.W.2d 936, 939 (Mo.App.1998).

The remainder of Driver's cross-examination tended to focus on the "vid-mark curve," discussed herein, and its relation to Workman's uncertainty as to Driver's BAC at the time he was *actually* driving.

Workman testified that the theory behind the "vid-mark curve" holds "that after consumption of alcohol, peak absorption generally occurs within an hour, and after that time the elimination rate from the blood and the body is at a rate of about .02 percent per hour." Workman conceded that various factors affect the rate of absorption. When asked whether injury was one of the factors affecting the rate of absorption, Workman testified that he was not aware of injury being identified as a relevant factor.

Driver then presented Workman with a report prepared by a Dr. Martinez, which indicated that the absorption rate of an injured person *may* be as much as two hours. Workman testified that he had not read the reference cited by Dr. Martinez, but that he could "agree with it, just on the grounds that [Dr. Martinez] is a physician."

However, nothing in this testimony contradicted Workman's earlier testimony regarding the results of his blood examination. While Driver did ask Workman questions about other factors, such as injury, that might have affected the rate of alcohol absorption, Driver failed to present any evidence that any of these factors applied to *him* and would have affected his rate of alcohol absorption that night. Thus, Driver presented no evidence that his BAC was, in fact, less than .10 percent at the time he was driving. Driver's questions of Workman merely show that Driver's BAC *might not* have reached the limit of .10 percent at the time of the accident. "Director is not required to show by scientific evidence that a driver had a BAC of .10 or more at the actual moment of driving when it can be reasonably assumed from the other evidence that his BAC at the time of driving was at least .10 [percent]." *Green,* 961 S.W.2d at 938. "When the legislature provided for the admissibility of BAC, it had to know that there would be some period of time from the determination of probable cause until the test was given." *Id.; see also Hieger v. Director of Revenue,* 733 S.W.2d 491, 493 (Mo.App. 1987).

Here, the Alcohol Influence Report reveals that Driver stated he started drinking beer at 7:30 p.m. the night of July 6, 2001. Driver also stated he had drunk several beers and had stopped drinking one hour prior to the accident.[4] According to the records submitted, the blood was drawn no earlier than 1:20 a.m. on July 7, 2001, as that was when Trooper Rowe filled out the request form. Thus, the blood was drawn at least one and one-half hours after Driver was involved in the accident, and two and one-half hours after Driver reported he stopped drinking. Thus, it can be reasonably assumed that Driver's BAC was at least .10 percent when he was driving. *See Green*, 961 S.W.2d at 938–39; *see also Verdoorn*, 119 S.W.3d at 547. Driver failed to present any evidence that would rebut Director's *prima facie* case that Driver's BAC was at least .10 percent while driving or that would create a legitimate credibility dilemma with respect to a material aspect of Director's case. *See Phelps*, 47 S.W.3d at 402; *Green*, 961 S.W.2d at 938–39.

Because Director established that the arresting officer had probable cause to arrest Driver for driving while intoxicated and that Driver was driving with a blood alcohol concentration of at least .10 percent, the trial court's judgment is not supported by substantial evidence and is against the weight of the evidence. *See Smith v. Director of Revenue*, 77 S.W.3d 120, 126 (Mo.App.2002). We reverse and remand with instructions that the trial court enter judgment upholding the suspension of Driver's driving privileges.

GARRISON, J., and RAHMEYER, C.J., concur.

J.L.M. and C.N.M., Plaintiffs,

---

4. The record shows the time of the accident was approximately 11:50 p.m.