**Kenneth PEARSON, et al., Appellants,**

v.

**Chris KOSTER, et al., Respondents.**

**Stan McClatchey, et al., Appellants,**

v.

**Robin Carnahan, Respondent.**

**Nos. SC 92317, SC 92326.**

Supreme Court of Missouri, En Banc.

May 25, 2012.

Rehearing Denied July 3, 2012.

Gerald P. Greiman, Frank Susman and Thomas W. Hayde Jr., Spencer Fane Britt & Browne LLP, St. Louis, and Keith A. Wenzel Spencer Fane Britt & Browne LLP, Jefferson City, for the Pearson challengers.

Richard E. Schwartz, St. Louis, for William Lacy Clay.

Jamie Barker Landes, Lee's Summit, for McCatchey challengers.

State Solicitor James R. Layton, Attorney General's Office, Jefferson City, for the State.

Todd P. Graves, Edward D. Greim and Clayton J. Callen, Graves Bartle Marcus & Garrett LLC, Kansas City, for the Legislators.

## PER CURIAM.

Under article III, section 45 of the Missouri Constitution, the General Assembly enacted H.B. 193 to redistrict Missouri for the election of the United States House of Representatives. Two groups of plaintiffs filed declaratory judgment actions to challenge the constitutional validity of the congressional redistricting map in H.B. 193 (the Map), claiming that it failed to meet the constitutional requirements for compactness. The trial court ruled that the plaintiffs failed to prove that the Map violates the requirement in article III, section 45 that each district be "as compact … as may be" and entered judgments in favor of the defendants. On appeal, the plaintiffs claim that the trial court's judgments erroneously interpret the constitutional standard for compactness and that the judgments are against the weight of the evidence.

This Court determines that the trial court did not err in its interpretation of the constitutional compactness standard because the standard does not require absolute precision in compactness and because mandatory and permissible recognized factors can impact the configuration of district boundaries. This Court further holds that the plaintiffs do not prevail on their claim that the trial court's judgment is against the weight of the evidence. This Court generally refuses to substitute its opinion for that of the trial court on disputed factual issues by re-weighing the evidence in a court-tried case. The parties strenuously disputed whether the challenged districts depart from the compactness principles and if they are "as compact … as may be," specifically whether minimal and practical deviations from compactness are supported by factors recognized by this Court. The trial court made credibility assessments and weighed the evidence at trial in reaching its judgments. Because this case involves judgments for the defendants, who have no burden of proof, and because neither party requested findings of fact that would assist in appellate review, this is not a case in which this Court should substitute its judgment for that of the trial court on the evidence regarding disputed factual issues.

Accordingly, this Court affirms the judgments of the trial court.

### Procedural History

The Missouri Constitution provides that the General Assembly shall divide the

state into districts based on the number of representatives to which it is entitled, as determined under the decennial census of the United States. Mo. Const. art. III, sec. 45. The Missouri Constitution requires the General Assembly to enact a map with districts that "shall be composed of contiguous territory as compact and as nearly equal in population as may be." *Id.* In May 2011, over the governor's veto, both houses of the General Assembly voted to approve the Map in H.B. 193.

Two groups, the Pearson Plaintiffs and the McClatchey Plaintiffs[1] (collectively, "Plaintiffs"), filed actions to challenge the Map under Mo. Const. art. III, sec. 45, each asserting claims that the districts were not "as compact . . . as may be." Defendants, Attorney General Chris Koster and Secretary of State Robin Carnahan, as well as intervenors Representative John. J. Diehl and Senator Scott T. Rupp,[2] filed motions to dismiss or for judgment on the pleadings. The trial court sustained the motions and dismissed both cases. Plaintiffs appealed to this Court.

This Court consolidated the cases and decided *Pearson v. Koster* on January 17, 2012. *See* 359 S.W.3d 35 (Mo. banc 2012) (*Pearson I*). In *Pearson I*, this Court affirmed the trial court's dismissal of Plaintiffs' petitions on every claim except the claims regarding compactness. *Id.* at 40. This Court stated:

> [I]t is a question of fact, yet to be tried, whether those districts are "as compact and nearly equal in population *as may be.*" Mo Const. art. III, sec. 45 (emphasis added). This Court makes no prejudgment on these issues, or on the compactness of other districts, other than to hold that Plaintiffs have stated a claim as to the compactness of the districts that is subject to proof and defenses in accordance with evidence as in any other lawsuit.

*Id.* This Court remanded the cases to the trial court for determination of the factual issues. *Id.*

On remand, the trial court held a trial to determine whether the districts are "as compact . . . as may be." Mo. Const. art. III, sec. 45. Plaintiffs and Defendants made various stipulations, and both presented evidence regarding whether the challenged districts are "as compact . . . as may be." After hearing the evidence, the trial court entered judgments in favor of both Defendants on February 3, 2012. It determined that the phrase "as compact . . . as may be" means that compactness cannot be achieved with absolute precision and permits districts to be drawn in multiple ways while still meeting the compactness requirement due to other factors. The trial court then found that, "[u]nder the standard and rationale announced by the Supreme Court, and the facts adduced at trial, the Plaintiffs have failed to prove that H.B. 193 is unconstitutional because it is not 'as compact as may be.'" Plaintiffs appeal.

On appeal, the Pearson Plaintiffs and the McClatchey Plaintiffs assert multiple claims of error in the trial court's judgments. The Pearson Plaintiffs claim that the trial court erred in: (1) applying an improper standard for determining whether the Map is as compact as may be; and

---

1. The Pearson Plaintiffs are Kenneth Pearson, Phoebe Ottomeyer, Brian Murphy, Mildred Conner, Timothy Brown, and Joan Bray. The McClatchey Plaintiffs are Stan McClatchey, Donna Turk, Ivan Griffin, Patricia Smith, Molly M. Teichmann, Laura Meeks, and Matt Ullman.

2. Intervenors are the respective chairs of the redistricting committees for the House and Senate.

(2) finding the Map as compact as may be under the facts, in that a visual observation and other maps show that it could be significantly more compact. The McClatchey Plaintiffs claim that the trial court erred in: (1) improperly interpreting the phrase "as compact ... as may be"; (2) failing to shift the burden to Defendants to justify deviations from compactness; and (3) failing to find that district 5 is not as compact as may be under the circumstances. Plaintiffs' points on appeal essentially constitute claims that the trial court's judgments erroneously apply the law and that they are against the weight of the evidence.

**Standard of Review**

■■■ This Court's decision in *White v. Director of Revenue* details the applicable standard of review for appeals of court-tried civil cases. 321 S.W.3d 298, 307–08 (Mo. banc 2010). The judgment of the trial court will be affirmed "unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Id.* (citing *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)). The application of this standard of review varies depending on the burden of proof applicable at trial and the error claimed on appeal to challenge the judgment. *See In re Adoption of W.B.L.*, 681 S.W.2d 452, 454 (Mo. banc 1984). The reviewing court cannot review the judgment of a trial court properly under a given standard of review without considering the burden of proof governing the trial court's determination.

■■■ The burden of proof applicable at trial depends on the type of claim presented in the pleadings. This case involves a challenge to the constitutional validity of a statute. For a court to find that a statute is unconstitutional, the plaintiff must overcome a burden of proof that assumes constitutional validity. *Mo. Prosecuting Attorneys v. Barton County*, 311 S.W.3d 737, 740 (Mo. banc 2010). The statute will not be held unconstitutional unless the plaintiff proves that it "clearly and undoubtedly contravene[s] the constitution" and "plainly and palpably affronts fundamental law embodied in the constitution." *Id.* at 740–41 (internal quotations omitted); *see also St. Louis Cnty. v. Prestige Travel, Inc.*, 344 S.W.3d 708, 712 (Mo. banc 2011). All doubts are "resolved in favor of the constitutionality of the statute." *Barton County*, 311 S.W.3d at 741 (internal quotations omitted).

■■■ In addition to the burden of proof, the reviewing court also must apply the proper standard of review for the error claimed on appeal. A claim that there is no substantial evidence to support the judgment or that the judgment is against the weight of the evidence necessarily involves review of the trial court's factual determinations. *See White*, 321 S.W.3d at 308. A court will overturn a trial court's judgment under these fact-based standards of review only when the court has a firm belief that the judgment is wrong. *Id.* A claim that the judgment erroneously declares or applies the law, on the other hand, involves review of the propriety of the trial court's construction and application of the law. *Id.* Implicit in these standards is the recognition that the trial court, in reaching its judgment, is in a better position to determine factual issues than an appellate court reviewing only the record on appeal. *See id.* at 308–09. In this regard, it is necessary for the reviewing court to treat differently questions of law and questions of fact.

■■■ This Court applies *de novo* review to questions of law decided in court-tried cases. *StopAquila.org v. City of Peculiar*, 208 S.W.3d 895, 899 (Mo. banc 2006). With respect to such questions,

"the appellate court reviews the trial court's determination independently, without deference to that court's conclusions." *Moore v. Bi–State Dev. Agency,* 132 S.W.3d 241, 242 (Mo. banc 2004). "The quintessential power of the judiciary is the power to make *final* determinations of questions of law," and courts may not delegate that authority to anyone else. *Asbury v. Lombardi,* 846 S.W.2d 196, 200 (Mo. banc 1993) (citing *Marbury v. Madison,* 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 (1803)).

▇▇▇▇ In reviewing of questions of fact, the reviewing court will defer to the trial court's assessment of the evidence if any facts relevant to an issue are contested. *White,* 321 S.W.3d at 308. A factual issue is contested if disputed in any manner, including by contesting the evidence presented to prove that fact. *Id.* As enunciated in *White,* a party can contest the evidence in many ways, such as by putting forth contrary evidence, cross-examining a witness, challenging the credibility of a witness, pointing out inconsistencies in evidence, or arguing the meaning of the evidence. *Id.* Once contested, "a trial court is free to disbelieve any, all, or none of th[e] evidence," and "the appellate court's role is not to re-evaluate testimony through its own perspective." *Id.* at 308–09. The trial court receives deference on factual issues " 'because it is in a better position not only to judge the credibility of the witnesses and the persons directly, but also their sincerity and character and other trial intangibles which may not be completely revealed by the record.' " *Id.* (quoting *Essex Contracting, Inc. v. Jefferson Cnty.,* 277 S.W.3d 647, 652 (Mo. banc 2009)).

▇▇▇▇ A claim of error on appeal may present a mixed question of law and fact.

In such an instance, the reviewing court applies the same principles articulated above except that it is necessary to segregate the parts of the issue that are dependent on factual determinations from those that are dependent on legal determinations. "[W]hen presented with an issue of mixed questions of law and fact, a [reviewing court] will defer to the factual findings made by the trial court so long as they are supported by competent, substantial evidence, but will review de novo the application of the law to those facts." 5 Am.Jur. 2D *Appellate Review* § 631 (2012). For example, when the issue is whether Missouri courts have personal jurisdiction over a defendant, a reviewing court defers to the fact-finding court with regard to any facts that are essential to that determination (e.g., the intention to create and sustain contacts with Missouri); however, the ultimate question of whether the exercise of jurisdiction meets the standards of the Missouri long-arm statute and the constitution remains a legal question, which is reviewed independently on appeal. *See Longshore v. Norville,* 93 S.W.3d 746, 751–54 (Mo.App.2002); *see also State v. Werner,* 9 S.W.3d 590, 595 (Mo. banc 2000) (applying *de novo* review to whether a defendant was "in custody" but deferring to the trial court with respect to facts essential to that determination); *State v. Brooks,* 185 S.W.3d 265, 273 (Mo.App.2006) ("While factual issues on motions to suppress often are mixed questions of law and fact, the trial court's superior capacity to resolve credibility issues is not dispositive of the 'in custody' inquiry." (citations omitted)). Therefore, it is a matter of deferring to the fact-finder in its assessment of the facts and then applying de novo review in determining how the law applies to those facts.[3] *White,* 321 S.W.3d at 307

**3.** As discussed *infra,* parties who desire to

know how the trial court sorted out these

("When the facts of the case are contested, this Court defers to the trial court's assessment of the evidence.").

### Discussion

#### A. Review of the trial court's judgment upholding the Map

As stated previously, review of the trial court's judgment upholding the constitutional validity of the Map requires consideration of the burden of proof at trial and the applicable standard of review. Although the McClatchey Plaintiffs do not challenge that they have the burden to show that the Map clearly and undoubtedly contravenes the constitution, *Barton County*, 311 S.W.3d at 740–41, they contend that, at a point in the trial, the burden of proof shifts to the Defendants. The Pearson Plaintiffs alternatively contend that review of the trial court's judgment should be *de novo* on the ground that this case largely consists of stipulated facts. Neither party is correct as to this Court's review of the trial court's judgment.

#### 1. Plaintiffs have the burden of proof at all times

As stated in *Pearson I*, a redistricting case is "subject to proof and defenses in accordance with evidence as in any other lawsuit." 359 S.W.3d at 40. Applying general law, "[t]he person challenging the validity of the statute has the burden of proving the act clearly and undoubtedly violates the constitution." *St. Louis Cnty.*, 344 S.W.3d at 712 (internal quotations and citations omitted). Although prior cases of this Court provide that statutes are "presumed" constitutional, a "presumption" is a term of art that

denotes a specific meaning in the law. A presumption is a "standardized practice, under which certain facts are held to call for uniform treatment with respect to their effect as proof of other facts." MCCORMICK ON EVIDENCE, section 337 (6th ed. 2006). The purpose behind stating that statutes are "presumed" constitutional is not to establish a presumption but instead to allocate the burden of proof to the plaintiff for its claim that a statute is unconstitutional—i.e., the plaintiff has the burden to show that a statute "clearly and undoubtedly violates the constitution." *See St. Louis Cnty.*, 344 S.W.3d at 712 (internal quotations and citations omitted).

In their claim that Defendants fail to meet their burden of proof, the McClatchey Plaintiffs erroneously state that Missouri law requires the burden of proof to shift to the state after a plaintiff makes an initial showing that a district could be more compact. Once the burden shifts, the state then would have to prove why the district is not substantially more compact. In support of this proposition, the McClatchey Plaintiffs cite the dissent in *Preisler v. Kirkpatrick*, which sought to shift the burden to the state in a challenge to the compactness of senate districts. *See* 528 S.W.2d 422, 436 (Mo. banc 1975) (Finch, J., dissenting), *overruled in part* by *Pearson I*, 359 S.W.3d at 39. Contrary to the McClatchey Plaintiffs' assumption, the majority of this Court did not shift the burden in that case, despite the inquiry into the subjective intent of the legislature at that time. *See id.* at 426; *see also Pearson I*, 359 S.W.3d at 40 (holding that a subjective test no longer applies and re-

---

mixed questions of fact and law have the ability to request written findings of fact. *Hammons v. Ehney*, 924 S.W.2d 843, 849 (Mo. banc 1996). A party who fails to make such a request forfeits that advantage on ap-

pellate review, because the trial court's findings are considered as having been found in accordance with the judgment. *See* Rule 73.01(c).

manding for the determination of factual issues "as in any other lawsuit.").

The McClatchey Plaintiffs also cite as support the United States Supreme Court's decision in *Karcher v. Daggett*, 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983). In relying on *Karcher*, the McClatchey Plaintiffs fail to recognize the distinction between the standard used by federal courts for challenges to redistricting maps under the United States Constitution and the standard for challenges under the Missouri Constitution. Under art. I, sec. 2 of the United States Constitution, the standard for population equality "requires that the State make a good-faith effort to achieve precise mathematical equality." *Kirkpatrick v. Preisler*, 394 U.S. 526, 530–31, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969). If the plaintiff shows that a deviation from population equality is not part of a good-faith effort of the legislature, federal courts shift the burden of proof, and "the State must bear the burden of proving that each significant variance between districts was necessary to achieve some legitimate goal." *Karcher*, 462 U.S. at 730–31, 103 S.Ct. 2653. Unlike the federal population equality standard, the existence of good faith in the legislature or lack thereof is irrelevant under the

requirements in the Missouri Constitution. In *Pearson I*, this Court expressly rejected the good faith standard and held that the applicable standard is the language of the constitution itself, which is an objective standard. 359 S.W.3d at 40.

It is Plaintiffs who seek a declaration that the Map is unconstitutional, and shifting the burden of proof conflicts with their ultimate burden to show that the Map "clearly and undoubtedly" contravenes the constitution. *See Johnson v. State*, 366 S.W.3d 11, 33 (Mo. banc 2012) (determining that plaintiffs failed to prove their case, because they "failed to prove that it is possible to achieve greater population equality and compactness when considering federal law requirements and other factors."). Placing the burden of proof on a plaintiff challenging a redistricting map is consistent with the framework used by nearly every state in the nation. The vast majority of states either have expressly rejected shifting the burden of proof[4] or have treated redistricting cases the same as other constitutional challenges and maintained the burden of proof on the plaintiff.[5] Only four states shift the burden of proof to the defendant after an initial showing by the plaintiff. Of those

4. *See, e.g., In re 1983 Legislative Apportionment of House, Senate, and Cong. Dists.*, 469 A.2d 819, 828 (Me.1983); *Ariz. Minority Coal. for Fair Redistricting v. Ariz. Indep. Redistricting Comm'n*, 220 Ariz. 587, 208 P.3d 676, 684 n. 7 (2009); *Holt v. 2011 Legislative Reapportionment Comm'n*, ——— Pa. ———, 38 A.3d 711, 737 (2012); *Parella v. Montalbano*, 899 A.2d 1226, 1233 (R.I.2006).

5. *See, e.g., Schneider v. Rockefeller*, 31 N.Y.2d 420, 340 N.Y.S.2d 889, 293 N.E.2d 67 (1972); *Stephenson v. Bartlett*, 357 N.C. 301, 582 S.E.2d 247, 247–48 (2003); *In re Constitutionality of House Joint Resolution 1987*, 817 So.2d 819, 825 (Fla.2002); *Davenport v. Apportionment Comm'n*, 65 N.J. 125, 319 A.2d 718, 723 (1974); *State ex rel. Gosch v. Lemler*,

77 S.D. 23, 84 N.W.2d 418, 419 (1957); *Kilbury v. Franklin Cnty. ex rel. Bd. of Cnty. Comm'rs*, 151 Wash.2d 552, 90 P.3d 1071, 1076 (2004); *In re Reapportionment of the Colo. Gen. Assembly*, 828 P.2d 185, 197 (Colo. banc 1992) ("[O]bjectors have failed to come forward with a concrete alternative plan for house districts.... Although the question is close, we conclude that the Final Plan for House District 62 and for the City of Westminster does not violate [the constitution]."); *Beaubien v. Ryan*, 198 Ill.2d 294, 298, 260 Ill.Dec. 842, 762 N.E.2d 501 (2001). The Supreme Court of Connecticut in *Fonfara v. Reapportionment Comm'n*, discussed shifting the burden of proof, but expressly did not decide the issue. 222 Conn. 166, 610 A.2d 153, 164–65 (1992).

four states, two shift the burden in redistricting challenges based on the state's constitution without providing any analysis,[6] one applies the federal framework without providing any rationale for doing so,[7] and the last shifts the burden based on a state statute specifically relating to reapportionment challenges.[8]

■ While federal courts apply a burden-shifting framework, they do so under a different constitutional standard, and there is no apparent rationale that supports a departure from the burden of proof applied by this Court in *Johnson*, at 32–33. Plaintiffs at all times have the burden of proving the Map is unconstitutional. The burden of persuasion and the burden of production never shift to the defendants. *See Anchor Centre Partners, Ltd. v. Mercantile Bank, N.A.*, 803 S.W.2d 23, 30 (Mo. banc 1991); *White*, 321 S.W.3d at 305.

**2. Whether a district is "as compact ... as may be" is a mixed question of law and fact**

■ Mo. Const. art. III, sec. 45 provides the compactness requirement for congressional districts. It states:

When the number of representatives to which the state is entitled in the House of the Congress of the United States under ... each census ... is certified to the governor, the general assembly shall by law divide the state into districts ..., which districts shall be composed of contiguous territory as compact ... as may be.

The determination of whether the compactness requirement is satisfied by the Map involves the determination of a mixed question of law and fact. The meaning of the language in Mo. Const. art. III, sec. 45 is a question of law to which *de novo* review applies. *Comm. for Educ. Equal. v. State*, 294 S.W.3d 477, 488 (Mo. banc 2009) ("[T]he trial court's interpretation of the Missouri Constitution [is a] question[ ] of law given de novo review."). In contrast, determining whether the characteristics of a particular map satisfy the meaning of the "as compact ... as may be" requirement involves questions of fact.[9] It is necessary, therefore, to analyze separately the legal determinations from the factual determinations on the issue of whether the challenged districts are as "compact ... as may be."

**B. The trial court did not erroneously declare the meaning of "as compact**

---

6. *See In re Legislative Districting of Gen. Assembly*, 193 N.W.2d 784, 791, *supplemented by* 196 N.W.2d 209 (Iowa 1972), *amended sub nom. Matter of Legislative Districting of Gen. Assembly*, 199 N.W.2d 614 (Iowa 1972); *Jackman v. Bodine*, 55 N.J. 371, 262 A.2d 389, 395 (1970).

7. *See In re Legislative Districting of State*, 370 Md. 312, 805 A.2d 292, 325 (2002). Of course, states generally apply the federal burden-shifting framework for redistricting challenges under the federal constitution. *See, e.g., Opinion of the Justices*, 353 Mass. 790, 230 N.E.2d 801, 804 (1967); *State ex rel. Lockert v. Crowell*, 656 S.W.2d 836 (Tenn. 1983); *Egan v. Hammond*, 502 P.2d 856, 867 (Alaska 1972).

8. *In re Reapportionment of Towns of Hartland, Windsor, and W. Windsor*, 160 Vt. 9, 624 A.2d 323, 327 (1993).

9. *Pearson I* recognized this distinction when this Court affirmed the dismissal on the pleadings of all of the Plaintiffs' claims except one, stating there "is a question of fact, yet to be tried, whether those districts are as compact and nearly equal in population *as may be*. Mo. Const. art. III, sec. 45 (emphasis added)," and "[t]his Court makes no prejudgment on these issues, or on the compactness of other districts, other than to hold that Plaintiffs have stated a claim as to the compactness of the districts that is subject to proof and defenses in accordance with evidence as in any other lawsuit." *Pearson I*, 359 S.W.3d at 40.

**... as may be" under Mo. Const. art. III, sec. 45**

Mo. Const. art. III, sec. 45 requires that the General Assembly draw the House districts according to census figures, making the districts: (1) contiguous territory; (2) as compact as may be; and (3) as nearly equal in population as may be. These requirements are mandatory and objective—each must be satisfied—although the language used in the requirements may allow some flexibility in their compliance. *See Johnson,* at 23–24. Plaintiffs claim that the trial court erred in defining the standard for the "as compact ... as may be" requirement, which this Court reviews de novo. *See StopAquila.org,* 208 S.W.3d at 899.

In *Pearson I,* this Court stated that "the applicable standard for a court in reviewing an article III, section 45 claim is the language of the constitution itself[.]" 359 S.W.3d at 40. This Court assumes that every word in the constitutional provision has effect and meaning. *Buechner v. Bond,* 650 S.W.2d 611, 613 (Mo. banc 1983). The primary rule is to "give effect to the intent of the voters who adopted the [provision]" by considering the plain and ordinary meaning of the words used. *Keller v. Marion Cnty. Ambulance Dist.,* 820 S.W.2d 301, 302 (Mo. banc 1991); *StopAquila.org,* 208 S.W.3d at 902.

This Court must consider the phrase "as compact ... as may be" in its entirety in order to ascertain its meaning and also give effect to every word used. *See Buechner,* 650 S.W.2d at 613. A determination of whether a district fails to satisfy the requirement cannot be accomplished solely by inquiring if it is "compact," because the modifier "as may be" alters the meaning of that word. *See* Mo. Const. art. III, sec. 45. As with statutes, the construction of constitutional provisions is not to be a hyper-technical process. *Donaldson v. Crawford,* 230 S.W.3d 340, 342 (Mo. banc 2007).

Accordingly, contrary to the urging of Plaintiffs, the test for whether a district is "as compact ... as may be" is not a two-part test. Instead, the test is a single inquiry as to whether, under the totality of the evidence, the challenged district is "as compact ... as may be." This test involves a determination of whether there is a departure from the principle of compactness in the challenged district and, if there are minimal and practical deviations, whether the district is nonetheless "as compact ... as may be" under the circumstances. *See Pearson I,* 359 S.W.3d at 40.

It is necessary to begin with the definition of the word "compact" in determining the meaning of the phrase "as compact ... as may be." Courts considering the definition of "compact" as used in the context of the reapportionment of districts have recognized two possible definitions. Some courts define "compact" as referring to "the physical shape or size of electoral districts," while others define it as referring to "closely united territory, a phrase not necessarily limited to physical dimensions." *See* Kurtis A. Kempter, Annotation, *Application of Constitutional "Compactness Requirement" to Redistricting,* 114 A.L.R.5th 311 (2003). A century ago, this Court adopted the latter definition, finding that "compact" for Missouri redistricting purposes means "closely united territory" and, in effect, rejecting the proposition that "compact" refers solely to physical shape or size. *See Pearson I,* 359 S.W.3d at 38 (quoting *State ex rel. Barrett v. Hitchcock,* 241 Mo. 433, 146 S.W. 40, 61 (1912)).

Because the word "compact" does not refer solely to physical shape or size, a visual observation, although relevant, is

not the decisive factor in determining whether a district departs from the principle of compactness. In fact, scholars have recognized that "compactness" is a vague standard and have developed various statistical measures to be utilized in determining compactness, as shown by two articles that were admitted into evidence. One article states that "multiple measures should be used whenever possible," and that there is no threshold level that can be shown by statistics.[10] Richard G. Niemi, et al., *Measuring Compactness and the Role of a Compactness Standard in a Test for Partisan and Racial Gerrymandering*, 52 J. Pol. 1155, 1176–77 (1990).

▮ Further, modification of the word "compact" with the phrase "as may be" recognizes that "compactness ... cannot be achieved with absolute precision." *Pearson I*, 359 S.W.3d at 39. The existence of multiple districts prevents absolute compactness, as it would be with circular boundaries, because the boundary of one district must fit the boundary of another district, all within state territory lines. The "as may be" standard also recognizes that there are other recognized factors that affect the ability to draw district boundaries with closely united territory. These factors include the impact of the standards for contiguous territory and population equality. *See* Mo. Const. art. III, sec. 45; *see also* `Pearson I`, 359 S.W.3d at 38. By virtue of the Supremacy Clause, U.S. Const. art. VI, cl. 2, the districts also must comply with the United States Constitution and federal laws, such as the Voting Rights Act. *See Johnson*, at 27–28.

In addition, the phrase "as may be," modifying the word "compact," permits consideration of other recognized factors that inherently are included within the constitutional standards governing the reapportionment process, although not expressly articulated as a separate requirement in the constitution. *See Johnson*, at 27–28. These factors were identified by this Court in *Preisler v. Doherty*, 365 Mo. 460, 284 S.W.2d 427 (1955), *Preisler v. Hearnes*, 362 S.W.2d 552 (Mo. banc 1962), and *Preisler v. Kirkpatrick*, 528 S.W.2d 422. In *Doherty*, this Court distinguished the process of city officers dividing St. Louis into districts from the process of redistricting the state because "it is obvious that it is much easier for them to make compact districts than for a legislature or commission restricted to county lines (or following town, ward or other district lines)...." 284 S.W.2d at 432. In *Hearnes*, a case challenging congressional districts, this Court stated that:

> [C]ounties are important governmental units, in which the people are accustomed to working together. Therefore, it has always been the policy of this state, in creating districts of more than one county (congressional, judicial or senatorial) to have them composed of entire counties.... We must hold that it was proper for the legislature to follow this policy. In fact, to do otherwise could lead to the most vicious kind of gerrymander. The only departure therefrom in the 1961 Act was in our two largest cities, St. Louis and Kansas City.... Urban conditions may justify this treatment.

362 S.W.2d at 556–57. The Court also stated that "it is not improper to consider the precedents of allocation of counties to existing districts in deciding the composition of new enlarged districts." *Id.* at 557.

Later, this Court in *Preisler v. Kirkpatrick* cited the United States Supreme

---

**10.** That does not mean that these measures are completely irrelevant but rather that they alone do not demonstrate that a map is or is not compact.

Court in *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), to recognize that "districting, without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering." 528 S.W.2d at 425 (internal quotations omitted). This Court also recognized that population density may affect boundary lines, stating that "population density of the state is, of course, uneven and any effort to accomplish both the overriding objective of [population equality] and the preservation of county lines reasonably may be expected to result in the establishment of districts that are not esthetically pleasing models of geometric compactness." *Id.* at 426.

■ As provided in these cases, the language used in the constitutional requirements implicitly permits consideration in the redistricting process of population density; natural boundary lines; the boundaries of political subdivisions, including counties,[11] municipalities, and precincts; and the historical boundary lines of prior redistricting maps.[12] This Court recently affirmed the continued propriety of recognized, unenumerated factors in *Pear-*

*son I. See* 359 S.W.3d at 40 (recognizing the importance of preservation of "the integrity of the existing lines of our various political subdivisions," despite not expressly stated as a separate consideration in the constitution).

Interpreting the language "as may be" as allowing for consideration of other recognized factors is consistent with the United States Supreme Court's requirement for congressional districts to have population equality "as nearly as is practicable" under its interpretation of the Equal Protection Clause in the United States Constitution. *See Reynolds*, 377 U.S. at 577, 84 S.Ct. 1362. The federal standard permits "minor variations which 'are based on legitimate considerations incident to the effectuation of a rational state policy.' " *Swann v. Adams*, 385 U.S. 440, 444, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967). As with this Court, the United States Supreme Court recognizes that legitimate considerations include recognition of natural boundary lines, recognition of historical district boundary lines, and respect for boundaries of political subdivisions.[13] *See id.; Karcher*, 462 U.S. at 740, 103 S.Ct. 2653.[14] Similar to the United States Su-

11. Although this Court's prior opinions, including *Pearson I*, recognize that county lines may validly be considered in reapportioning congressional and house districts, the Missouri Constitution makes it a mandatory factor in the reapportionment of senate districts. *See* Mo. Const. art. III, secs. 5 and 7.

12. Consideration of historical district boundaries allows residents of a district to continue any relationships such residents may have established with their elected representatives and to avoid the detriment to residents of having to reestablish relationships when district boundaries change.

13. In *Kirkpatrick v. Preisler*, the Supreme Court recognized an exception to the consideration of county or municipal boundaries in a challenge to the population equality of congressional districts under the United States

Constitution, stating that it is improper to justify deviations based on political subdivision boundaries. 394 U.S. at 533–34, 89 S.Ct. 1225. Since *Kirkpatrick v. Preisler*, however, the Supreme Court expressly identifies respect for municipal and county boundaries as legitimate considerations in congressional redistricting. *See Abrams v. Johnson*, 521 U.S. 74, 98, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997) (citing *Karcher*, 462 U.S. at 740, 103 S.Ct. 2653); *see also Bush v. Vera*, 517 U.S. 952, 963, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996).

14. The Supreme Court also has stated that certain factors cannot be considered when seeking to attain population equality under the United States Constitution. In *Reynolds v. Sims*, the Supreme Court detailed that "history alone [referring to history as the histori-

preme Court's interpretation of the "as nearly as is practicable" standard under the Equal Protection Clause, this Court interprets the requirements in the Missouri Constitution to implicitly permit the legislature to comply with federal laws and consider recognized factors yet still comply with the requirements of the Missouri Constitution. The requirement for compactness "as may be" allows for consideration of these recognized factors. *See Pearson I*, 359 S.W.3d at 39.

This Court's precedent does not hold that constitutional requirements can be disregarded to consider other factors but instead recognizes that the constitutional requirements themselves incorporate such considerations by use of the standard "as may be." Plaintiffs recognized that the constitutional requirements incorporate other factors by presenting evidence at trial and making arguments on appeal regarding the boundary lines for historical district maps, counties, and political subdivisions. As part of the standard for the constitutional requirements, federal law and the other recognized factors are in fact of constitutional significance, and this Court recognizes that in its precedent. Each of these factors plays a role in determining the fact-based inquiry of whether a district is "as compact . . . as may be." If a district seems not to be composed of closely united territory because of minimal and practical deviations, the district is still "as compact . . . as may be" if those deviations are due to mandatory and permissive factors. "[M]aps could be drawn in multiple ways, all of which might meet the constitutional requirements." *Id.* at 39.

Under this construction of the phrase "as compact . . . as may be," the trial court did not erroneously declare or apply the compactness requirement in Mo. Const. art. III, sec. 45. The trial court's judgment, which determined that absolute precision is not required and that other factors may affect compactness, is consistent with the proper construction of the constitutional provision.

**C. The trial court did not err in concluding that Plaintiffs failed to prove that the Map clearly and undoubtedly contravenes the constitution**

Plaintiffs assert that the trial court's judgment, which determined that Plaintiffs failed to meet their burden of proof that the Map is unconstitutional, is against the weight of the evidence. This Court will overturn a trial court's judgment on the ground that it is against the weight of the evidence—with the term "weight" referring to the probative value (not quantity) of the evidence—only if it has a firm belief that the judgment is wrong. *White*, 321 S.W.3d at 308–09. The weight of the evidence standard from *Murphy v. Carron* was discussed in *State Farm Mut. Auto Ins. Co. v. Allen*: "The purpose of the ['weight of the evidence'] rule should be read in context. The purpose of the rule is to give the findings of fact of the trial court the approximate effect of a jury verdict, especially when weighing and credibility are involved." 744 S.W.2d 782, 786 (Mo. banc 1988) (footnote omitted). On finding that the record in *State Farm Mut. Auto Ins. Co.* showed a factual dispute regarding insurance policy coverage, this Court was "not willing to substitute [its] judgment for that of the trial court" by

cal number of districts as a basis for representation, not the location of historical boundary lines as later identified in *Swann* ], nor economic or other sorts of group interests, are permissible factors in attempting to justify

variances from population-based representation. . . . Considerations of area alone provide an insufficient justification for deviations from the equal-population principle." 377 U.S. at 580, 84 S.Ct. 1362.

weighing the evidence and affirmed the trial court's judgment *Id.* at 787.

This Court rarely has reversed a trial judgment as against the weight of the evidence under the *Murphy v. Carron* standard. In *Buckner v. Jordan*, for instance, this Court reversed a judgment in favor of a plaintiff as against the weight of the evidence. 952 S.W.2d 710, 712 (Mo. banc 1997). The case involved a determination of a father's child support obligation, and the circumstances of the case revealed that the trial court failed to consider an affidavit by the mother that showed her increased income. *Id.* Because of the complete failure to consider the affidavit by the trial court, this Court weighed the evidence and determined that the trial court erred in its judgment. *See id.*

This case does not present the rare circumstance when the trial court's judgment should be reversed as against the weight of the evidence. Significantly, Plaintiffs' weight of the evidence claim challenges a judgment in favor of Defendants. Defendants have no burden of proof in this case and were not required to present any evidence to prevail. *See State*

*Farm Mut. Auto. Ins. Co.*, 744 S.W.2d at 786 (refusing to weigh evidence in court-tried case in which the trial court's judgment was for the defendant). Plaintiffs' claim that the challenged districts were not "as compact ... as may be" required the trial court to weigh evidence and make factual determinations. *See Pearson I*, 359 S.W.3d at 40 ("[I]t is a question of fact, yet to be tried, whether those districts are 'as compact and nearly equal in population *as may be.*'"). The parties had the ability to request written findings of fact to identify the precise issues they wanted the trial court to determine for each district, but neither party made a proper request.[15] Because the parties did not request findings, this Court does not have the benefit of specific, articulated conclusions as to the determination that the districts are "as compact ... as may be." Without written findings of fact, this Court views the facts in the light most favorable to the trial court's judgment. Rule 73.01.

### 1. The Map, H.B. 193

The Map was admitted into evidence by stipulation of the parties. Plaintiffs challenged the constitutional validity of districts 3, 5, and 6.

---

15. In any case tried without a jury, "[t]he court may, or if requested by a party shall, include in the opinion findings on the controverted fact issues specified by the party." Rule 73.01. "[I]t is the parties' *duty* to specifically request findings of fact and conclusions of law" and to identify "the issues they wish the court to decide." *Hammons*, 924 S.W.2d at 849 (emphasis added). "Merely submitting proposed findings to aid the court does not trigger the court's duty to make findings of fact and law." *Id.*

### 2. Plaintiffs' burden of proof

 As discussed above, Plaintiffs, at all times, bore the burden of proving that the Map clearly and undoubtedly contravened the constitution. Because the standard for determining whether a district is drawn "as compact . . . as may be" includes whether any minimal and practical deviations were a result of recognized factors that may affect the district boundaries, Plaintiffs must prove that the boundaries of districts 3, 5, and 6 depart from the principles of compactness and that any deviations were not minimal or practical deviations resulting from applying the recognized factors. Accordingly, Plaintiffs' showing must account for any minimal and practical deviations occurring as a result of: (1) the interrelationship in standards for the population equality and compactness requirements; (2) the contiguity requirement; (3) federal laws, including the Voting Rights Act; and (4) the recognized factors of population density, natural boundary lines, boundaries of political subdivisions, and historical boundary lines of prior redistricting maps. While the existence of evidence regarding each of these factors satisfies Plaintiff's burden of production, Plaintiffs nonetheless may fail to satisfy their burden of persuasion with the trier of fact that, based on the evidence presented, the challenged districts clearly and undoubtedly contravene the constitution.

### 3. The trial court did not err in concluding that Plaintiffs failed to prove that district 3 clearly and undoubtedly contravenes the constitution

 Plaintiffs claim that the trial court's judgments finding that they failed to meet their burden of proving that district 3 is not "as compact . . . as may be" is against the weight of the evidence. Evidence presented at trial could support the trial court's determination that the minimal and practical deviations in district 3 are supported by Voting Rights Act con-

siderations. Evidence at trial established that the district boundaries for every district are interrelated and that some districts must be drawn less compactly because of the shape of neighboring districts. Evidence at trial supports a finding that this is the case with districts 1, 2, and 3.

The parties presented evidence that the boundaries for districts 1 and 2 were drawn in a circular manner to comply with the Voting Rights Act by boosting the minority population of district 1 and generally protecting against minority "vote dilution." The purpose of the Voting Rights Act is to ensure that members of a protected class have the same opportunity as other citizens to participate in the political process and elect representatives of their choice. 42 U.S.C. § 1973(b) (2000). Defendants' expert, Dr. Hofeller,[16] explained that when a district is shaped like a circle, neighboring districts must necessarily be "crescent-shaped." Because districts 1 and 2 are nearly circles, it can be expected that the surrounding district—district 3— would take on a crescent shape. This accurately describes the areas of district 3 that extend around districts 1 and 2. Given the reasoning for the shapes of districts 1 and 2 and the knowledge that the shape of district 3 must adjust to its adjoining districts, the trial court could conclude that Plaintiffs failed to prove that district 3 was not "as compact . . . as may be."

**4. The trial court did not err in concluding that Plaintiffs failed to prove that district 5 clearly and undoubtedly contravenes the constitution**

Plaintiffs claim that the trial court's judgments finding that they failed to meet their burden of proving that district 5 is not "as compact . . . as may be" is against the weight of the evidence. In assessing the evidence regarding whether district 5 is sufficiently compact, the trial court considered the stipulations and evidence presented by the parties during the three-day trial. The parties stipulated to the Map and the statistical evidence regarding compactness, population equality, and racial composition of the relevant districts. While these stipulations of fact relieved the parties from proving the matters stipulated, *In re Marriage of Hendrix*, 183 S.W.3d 582, 591 (Mo. banc 2006), the stipulations do not prove, as a matter of law, that district 5 does not meet the constitutional standard for compactness. Some of the stipulated evidence is favorable to a finding that district 5 is "as compact . . . as may be." Additionally, through evidence presented at trial and the cross-examination of Plaintiffs' expert, Dr. David C. Kimball, Defendants zealously disputed multiple factual issues relevant to determining whether district 5 was "as compact . . . as may be."

The trial court had evidence before it, the Map, showing that district 5 is not in the shape of a circle or square, which the experts testified are the most compact shapes. If the constitutional standard for compactness were merely that a district be circular or square, the visual inspection of district 5 would demonstrate that it is neither.[17] The Missouri

---

**16.** Much of Dr. Hofeller's testimony addressed compactness of the Map as a whole. But in *Pearson I*, this Court particularly noted that the protection of art. III, sec. 45 "applies to each Missouri voter, in every congressional district." *Id.* at 39. As such, each congressional district must be "as compact . . . as may be." Dr. Hofeller's testimony regarding

compactness of the Map as a whole, therefore, has limited relevance.

**17.** The experts also testified that the impossibility of drawing a redistricting map with all districts being the shape of a circle makes it clear that perfect compactness is not intended by constitutional standards for compactness.

constitutional standard of "as compact ... as may be" requires, instead, that each district be "closely united territory" as may be, rejecting the proposition that "compact" refers solely to physical shape or size. *See Barrett*, 146 S.W. at 61. The boundaries for district 5 are not so egregiously drawn that it could be found to violate the compactness standard as a matter of law. There exists a question of fact whether it is closely united territory with practical and minimal deviations from compactness resulting from application of recognized factors.

 The parties stipulated to the results of eight statistical tests measuring compactness.[18] While some of these statistics measure the level of compactness of the Map as a whole, there were also measures of the individual districts. Plaintiffs' expert, Dr. Kimball, testified that the alternative maps introduced by Plaintiffs scored better on the majority of the compactness measures and, as a result of the statistical measures and his visual examination, he opined that district 5 was not "as compact ... as may be."[19] When cross-examined, however, he testified that the standard for compactness is not a precise standard and that there is no bright line between a compact and non-compact district. He acknowledged that the statistical tests do not produce a percentage threshold for determining whether a district can be more compact. He further testified that it was possible to make

Plaintiffs' alternative maps more compact so, under his comparison standard of compactness, Plaintiffs' proposed maps of district 5 would not be "as compact ... as may be." He also testified that he never used any mathematical tests to compare the compactness of congressional districts before this case. Importantly, he testified that he does not know if it is possible to draw the most compact district if controlling for population equality, voting rights, and other factors. He did not consider such factors or anything else, such as the dispersion of population in a district, when forming his opinion of the compactness of district 5.

Defendants presented the testimony of Dr. Hofeller regarding the compactness of district 5. Dr. Hofeller testified as to the principles relevant to determining compactness, the meaning of the phrase "as compact ... as may be" and opined as to whether district 5 meets that standard.[20] Dr. Hofeller also testified as to the meaning and application of the statistical measures of compactness to which the parties stipulated. He testified that, while statistical measures are helpful, there is no statistical measure or specific score that conclusively indicates that a map is compact. Instead, he testified that compactness is measured on a continuum. According to Dr. Hofeller, there may be instances in which a district boundary does or does not satisfy the compactness principles, but

---

18. Although these statistical measures do not establish a threshold for determining when a district is or is not compact, both Plaintiffs' and Defendants' experts testified that such measures are relevant to the evaluation of compactness. Therefore, they could have been a factor relied on by the trial court.

19. To the extent that Dr. Kimball testified regarding an issue that is solely a question of law, this Court will give no more deference to his opinion than to the trial court's ruling on an issue of law. *See Howard v. City of Kansas*

*City,* 332 S.W.3d 772, 785 (Mo. banc 2011). This Court could not simply defer to the trial court, an expert, or anyone else as to legal questions without abandoning its constitutional duty to be the final arbiter as to what the law is in Missouri. *See id.*

20. Any testimony of Dr. Hofeller regarding an issue that is solely a question of law is given no deference on the same basis as that set forth in footnote 19.

there is no bright line in determining it. Under this continuum, Dr. Hofeller testified that district 5 falls in the area of being compact. This testimony disputes Plaintiff's claim that the districts are not "as compact . . . as may be" and was weighed by the trial court in reaching its decision.

Both Drs. Kimball and Hofeller testified that the same eight statistical measures are used to evaluate compactness. These measures were discussed at length in the redistricting articles admitted into evidence at trial. The parties stipulated as to how district 5 scored on each of these statistical measures. District 5 scored well on the measures of compactness that consider area in combination with population. Plaintiffs presented no other evidence regarding population density.

There was also evidence produced at trial disputing whether the boundaries for district 5 were affected by historical district boundaries. This evidence consisted of the prior redistricting maps shown in Appendix A. These maps demonstrated that a portion of Jackson County historically has been carved out of district 5 and appended to other districts (both districts 4 and 6). The current Map only slightly expands that carved-out portion. Plaintiffs' expert, Dave Rolland, a constitutional attorney, was questioned about these historical maps at length during both direct examination by Plaintiffs and cross-examination by Defendants.

Finally, evidence was presented regarding the effect of political subdivision boundaries on the boundaries for district 5, including both urban and rural areas of Jackson County. The evidence could support a finding by the trial court that, while district 5 divides certain political subdivisions, it maintained the boundary lines of other subdivisions, specifically municipalities north of the Missouri River. For example, the boundary for district 5 gener-ally follows the boundary for Gladstone, which is surrounded by Kansas City. The evidence also showed that district 5 includes a portion of Clay County, including urban portions of Kansas City that continue from Jackson County into Clay County. The trial court could have found that the boundaries of the Map were drawn in consideration of the legitimate factor of keeping a greater portion of Kansas City in district 5.

This record reveals factual disputes regarding whether the deviations in the boundary of district 5 were minimal and practical deviations that could have been drawn to take into account certain recognized factors. *See State Farm Mut. Auto. Ins. Co.,* 744 S.W.2d at 787. The trial court was free to consider the weight and credibility of the evidence on the record. From that assessment, the trial court could have objectively determined that Plaintiffs failed to prove clearly and undoubtedly that district 5 is not as "compact . . . as may be." This Court will not substitute its judgment for that of the trial court by re-evaluating the credibility of that evidence in this case. *Id.*

**5. The trial court's judgment regarding district 6 is not against the weight of the evidence**

Because the trial court did not err in its judgments regarding district 5, and because the boundary in district 5 has a direct correlation to the boundary in district 6, the same analysis applies. Therefore, this Court finds no error in the trial court's judgment regarding district 6.

### Conclusion

Accordingly, this Court finds no error in the trial court's judgments. The judgments of the trial court are affirmed.

BRECKENRIDGE and FISCHER, JJ., and MITCHELL and LYNCH, Sp.JJ., concur.

FISCHER, J., concurs in separate opinion filed; LYNCH, Sp.J., concurs in opinion of FISCHER, J.

PRICE, J., dissents in separate opinion filed; STITH, J., and ELLIS, Sp.J., concur in opinion of PRICE, J.

TEITELMAN, C.J., RUSSELL and DRAPER, JJ., not participating.

**Appendix A**

The Missouri Congressional Map of 1921 placed the northwestern and central-western wards of Kansas City into a district with Platte, Clinton, Clay, and Ray counties. The southwestern wards of Kansas City and eastern and southern Jackson County comprised their own discrete district.

CONGRESSIONAL DISTRICTS.

The Congressional map of 1933 created a separate district for metropolitan Kansas City, and placed the remainder of Jackson County in its own Congressional District.

CONGRESSIONAL DISTRICTS.

1943

The map of 1943 is the same as the 1933 map.

CONGRESSIONAL DISTRICTS

POPULATION BY DISTRICTS

1952

The map of 1952 continued to give the Kansas City portion of Jackson County its own district (the fifth) but united the remainder of Jackson County with Lafayette, Cass, Johnson, Henry, Davies, Vernon, and Barton counties (the fourth district).

The Ten
CONGRESSIONAL
DISTRICTS
of Missouri

Population by Districts

1962

The map of 1962 expanded the fifth district, and, added Henry and Pettis Counties to the fourth, while taking Barton County away from that district.

THE
TEN
CONGRESSIONAL
DISTRICTS
OF MISSOURI

1972

The map of 1972 expanded the fifth district southward, so that approximately the western third of Jackson County's geographic area was now one district. The map added Barton back into the fourth district, and it also added St. Clair, Hickory, Benton, Morgan, Cooper, Howard, and Saline counties to that district.

The map of 1982 split Jackson County in half, geographically. The eastern half of Jackson was united with numerous other counties to the south and east.

Missouri's Congressional Districts

1992

The map of 1992 created the downward protrusion. In this map, Jackson County was split between three different Congressional Districts. The bottom south-east corner continued to be untied with the fourth district. The downward protrusion, which is shaped somewhat like the state of Massachusetts, except with the thin hook extending southward instead of eastward, was united with counties in the northwest and the north-central part of Missouri (the sixth district). The remainder of Jackson County comprised district five.

The map of 2002 extended district five to the southeast corner of Jackson County. Under this map, the downward protrusion continued to be united with the sixth district (northwest and north-central Missouri). Only a tiny peninsula of Jackson County remained united with the district four (west central Missouri). In addition, the 2002 map extended district five to include an irregularly shaped portion of Cass County (south of metropolitan Kansas City).

The Map in 2012 extends the downward protrusion southward, so that district six contains more of Jackson County. The fifth district picks up the small portion of Jackson County that had continued to be in the fourth district, and it also extends to the east and slightly to the north to include Ray, Lafayette, and Saline counties. A portion of Cass County goes from the fifth district back to the fourth.

ZEL M. FISCHER, Judge, Concurring Opinion.

I concur in the *per curiam* opinion's holding, affirming the circuit court's ruling that the Plaintiffs failed to demonstrate that HB 193 "clearly and undoubtedly" contravened the constitution. I write separately to clarify the standard of law applicable to the issues presented to this Court in this case and address some of the concerns voiced by the dissenting opinion.

In *Pearson I*, this Court held that challenges to the compactness of a district are justiciable and that the standard a circuit court should apply in reviewing such a challenge is the language of section 45 itself. *Pearson v. Koster*, 359 S.W.3d 35, (Mo. banc 2012) (*Pearson I*). Following remand and a factual finding, the circuit court upheld the General Assembly's proposed redistricting map in this case. The circuit court entered a judgment concluding, **"Under the standard and rationale announced by the Supreme Court, and the facts adduced at trial, the Plaintiffs have failed to prove that H.B. 193 is unconstitutional because it is not as compact as may be."**[1] The dissenting opinion does not deny that the circuit court's judgment is supported by substan-

---

1. The dissenting opinion does not contend that the circuit court erred or misapplied the law in any respect including, but not limited to, the notion that the burden of proof always remained on the Plaintiffs and that the ultimate fact issue to be decided was whether the Map and each district were as compact as may be.

tial evidence, but the dissenting opinion would reweigh the evidence and reverse the judgment, claiming it is against the weight of the evidence.[2]

In my view, if due deference is given to the circuit court's evaluation of the credibility of the witnesses and the probative value of the evidence as required by law, then the circuit court's judgment should be affirmed. The dissenting opinion's position that this Court (or, presumably, under its analysis any intermediate appellate court) gets to determine the probative value of the evidence is unprecedented.

The pertinent part of *Pearson I* instructed the circuit court on remand as follows:

First, redistricting is predominately a political question. Decisions must be made regarding a number of sensitive considerations to configure the various House districts. These maps could be drawn in multiple ways, all of which might meet the constitutional requirements. These decisions are political in nature and best left to political leaders, not judges. Second, compactness and numerical equality are mandatory. To the extent that they are achieved, numerous other constitutional problems are avoided. Third, compactness and numerical equality cannot be achieved with absolute precision. This is recognized by the "as may be" language used in article III, section 45.

While an appropriate standard of review must reflect deference to the predominate role of the General Assembly and the inability of anyone to draw compact districts with numerical precision, Missouri courts nonetheless must uphold

the mandatory language of the constitution that the "districts *shall be* composed of contiguous territory as compact and as nearly equal in population as may be." Mo. Const. art. III, sec. 45 (emphasis added). The protection of this constitutional provision applies to each Missouri voter, in every congressional district.

*Id.* at 39.

As long as the districts comply with these constitutional requirements, the circuit court shall respect the political determinations of the General Assembly, which allow for "maps [that] could be drawn in multiple ways, all of which might meet the constitutional requirements." *Id.* The circuit court applied the standards as instructed by this Court. and now this Court reviews the "proof and defenses in accordance with evidence in any other lawsuit." *Id.* at 40.

The dissent fails to articulate a standard for compactness beyond a visual observation, stating that "[w]here, however, a nonpartial and objective observer can plainly see that a district is noncompact, deviations from compactness are not minimal." The dissenting opinion continually uses phrases such as "bizarrely shaped" and "visually jarring" to support its position. However, if a pure cursory glance at the map, by itself, were sufficient to determine whether the constitutional standard of "compact as may be" were met, the remand from *Pearson I* would not have been necessary at all. In fact, this is contrary to *Pearson I*, which specifically states that "compactness and numerical equality cannot be achieved with absolute precision" and that "an appropriate standard of re-

---

2. To the extent that the dissenting opinion argues that the Plaintiffs in this case were unaware of the factors the legislature was allowed to consider in drafting its Map and that the case should be remanded in the inter- ests of fairness, the record clearly shows that the Plaintiffs presented evidence pertaining to those recognized factors, including political subdivisions, natural and historic boundary lines, and population density.

view must reflect deference to the predominate role of the General Assembly and the inability of anyone to draw compact districts with numerical precision." *Pearson I*, 359 S.W.3d at 39.

## Standard of Review

The standard of review for any court-tried case is that this Court will affirm the judgment of the circuit court unless it misapplied or erroneously declared the law, or the judgment is not supported by substantial evidence, or the judgment is against the weight of the evidence. *JAS Apartments, Inc. v. Naji*, 354 S.W.3d 175, 182 (Mo. banc 2011) (citing *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976)); *see also* Rule 84.13(d). If the issue to be decided is one of fact, as is presented in this case, this Court determines whether the judgment is supported by substantial evidence and whether the judgment is against the weight of the evidence. *Id.* "Appellate courts should exercise the power to set aside a decree or judgment on the ground that it is 'against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong." *Id.* When the burden of proof is placed on a party for a claim that is denied, the trier of fact has the right to believe or disbelieve that party's uncontradicted or uncontroverted evidence. *Bakelite Co. v. Miller*, 372 S.W.2d 867, 871 (Mo.1963). If the trier of fact does not believe the evidence of the party bearing the burden, it properly can find for the other party. *White v. Dir. of Revenue*, 321 S.W.3d 298, 305 (Mo. banc 2010). "Generally, the party not having the burden of proof on an issue **need not offer *any* evidence** concerning it." *Id.* (Emphasis added.) "The trier of fact has the right to disbelieve evidence, even when it is not contradicted." *Id.* at 307.

This standard for reviewing an against-the-weight-of-the-evidence challenge does not change just because the evidence is derived from stipulations, exhibits, and documents. "In other words, even though this Court has the same opportunity to review the evidence as does the circuit court, the law allocates the function of fact-finder to the circuit court." *MSEJ, LLC v. Transit Cas. Co.*, 280 S.W.3d 621, 623 (Mo. banc 2009). "When the facts of the case are contested, this Court defers to the circuit court's assessment of the evidence." *White*, 321 S.W.3d at 307. While a party can contest evidence by putting forth evidence to the contrary, a party can also contest evidence by cross-examination or by pointing out internal inconsistencies in the evidence. *Id.* at 308.

In a court-tried case, "[i]t is the parties' duty to specifically request findings of fact and conclusions of law, identifying the issues they wish the court to decide." *Hammons v. Ehney*, 924 S.W.2d 843, 849 (Mo. banc 1996). "Merely submitting proposed findings to aid the court does not trigger the court's duty to make findings of fact and law." *Id.* Neither party in this case requested findings of fact from the circuit court. Therefore, "[a]ll fact issues upon which no findings are made shall be considered as having been found in accordance with the result reached."[3] Rule 73.01(c).

---

3. Rule 73.01(c) states, in pertinent part:
 The court may, or if requested by a party shall, include in the opinion findings on the controverted fact issues specified by the party. Any request for an opinion or findings of fact shall be made on the record before the introduction of evidence at trial or at such later time as the court may allow.
 All fact issues upon which no specific findings are made shall be considered as having been found in accordance with the result reached.

## The Burden of Proof is on the Plaintiffs

There are two sets of plaintiffs challenging the Map in this case. The Pearson Plaintiffs did not even raise an against-the-weight-of-the-evidence challenge in their brief to this Court. The McClatchey Plaintiffs did raise an against-the-weight-of-the-evidence challenge in their point relied on, dependent on the finding that "a reasonable person would find that the district could be made substantially more compact without adverse consequences to other districts or other constitutional or practical considerations," and the McClatchey Plaintiffs tried their case on a standard that adopted a shifting of the burden to the State to "justify deviations from reasonable compactness." This Court declines to shift the burden to the State, although the dissenting opinion implicitly adopts such a burden shifting when it states that "there is little probative evidence that supports finding the Map compact."[4] Op. at 79. But the State did not bear the burden of showing that the map was compact. That burden rested firmly with the Plaintiffs to prove clearly and undoubtedly that the challenged district deviates from the principle of compactness and also that it is not a minimal and practical deviation because of recognized factors. The circuit court is never required to find that the Map is compact. If it finds for Plaintiffs, it must find that the challenged district "clearly and undoubtedly" is not a minimal and practical deviation because of the recognized factors and, therefore, is not "as compact . . . as may be." If it finds for the State, as it did here, the circuit court only need find that the Plaintiffs failed to prove "clearly and undoubtedly" that the map was not "as compact . . . as may be."

The circuit court ruled that the Plaintiffs had failed to present credible or probative evidence that satisfied their burden of proof in demonstrating that H.B. 193 "clearly and undoubtedly" contravened the constitution.

The dissenting opinion does not give due deference to the circuit court's determination of the credibility of the witnesses and the circuit court's evaluation of the probative value of the evidence as required by this Court's well-settled case precedents and court rules. The omission of material, favorable evidence from the weighing process strips the dissenting opinion's attempted demonstration that it has a firm belief that the judgment is wrong of any analytical value or persuasiveness.

## Analysis

The proper inquiry on appeal is whether the evidence introduced at trial leaves this Court with a firm belief that the circuit court's judgment that the Plaintiffs failed to satisfy their burden is against the weight of the evidence. See *Naji*, 354 S.W.3d at 182.

An against-the-weight-of-the-evidence challenge requires constant acknowledge-

---

4. The dissenting opinion continually, and incorrectly, holds the State responsible for a burden of introducing "evidence, testimonial or otherwise, that explained the shapes of districts 5 and 6 as they appear in the Map. There was no evidence showing that dividing Blue Springs, Independence, and other Jackson County communities between two districts made the Map more compact. There was no evidence explaining the removal of almost 80,000 people from the center of Jackson County, in what would otherwise be district 5. No evidence explained why roughly 80,000 citizens from Ray, Saline, and Lafayette counties should be tacked on to the rest of the district. There was no evidence explaining why over 73,000 citizens of southwestern Clay County should join the rest of Jackson County in district 5. Because there is no evidence relating to this point, obviously there can be no weight assigned to it." Op. at 79.

ment of and adherence to the well-established principle that " '[t]he trial court is free to believe or disbelieve all, part or none of the testimony of any witness.' " *Sch. Dist. of Kansas City v. State,* 317 S.W.3d 599, 612 (Mo. banc 2010) (*quoting Watson v. Mense,* 298 S.W.3d 521, 525–26 (Mo. banc 2009)). As previously discussed, fact issues on which no findings were made are considered as having been found in accordance with the result reached. The application of this principle means that the identification of favorable evidence should include all favorable testimony in the record because the circuit court was free to believe it, and the identification of contrary evidence in the record must exclude any testimony (other than the Map itself) because the circuit court was free to disbelieve it.

Because the circuit court was free to disbelieve all testimonial evidence related to whether districts five and six are as compact *as may be,* only a visual inspection of the Map remains to weigh on that issue. In *Pearson I,* however, this Court determined that the Map was insufficient evidence; it does not inform as to population density, history or traditional communities of interests, or other circumstances the legislature may consider when drawing districts. The absence of evidence found credible by the circuit court in these circumstances supports the circuit court's determination that "Plaintiffs have failed to prove that H.B. 193 is unconstitutional because it is not 'as compact as may be.' "

### Conclusion

The dissenting opinion fails to apply the standard of review required by this Court's recent decision in *White v. Dir. of*

*Revenue* or give due deference to the circuit court's function to have adjudged the probative value of the evidence and the credibility of the witnesses in weighing the evidence. Following the "rule of law" includes not only stating the appropriate standard of review but also applying the appropriate standard of review based on the record. Properly doing that, this is not a close case. I fully concur in the principal opinion.

WILLIAM RAY PRICE, JR., Judge, Dissenting Opinion.

### I. Introduction

Article III, section 45 of the Missouri Constitution requires the General Assembly to redraw districts for the election of delegates to the United States House of Representatives every 10 years. To protect Missouri voters from political gerrymandering, the drafters of the constitution expressly required that all districts "be composed of contiguous territory as compact and nearly equal in population as may be." This Court recently reaffirmed that legal challenges to congressional redistricting maps based on article III, section 45's compactness requirement are justiciable. *Pearson v. Koster,* 359 S.W.3d 35, 39 (Mo. banc 2012) (*Pearson I*). Nevertheless, a majority of the Court today refuses to enforce article III, section 45.

By per curiam opinion, the Court upholds a map with a teardrop-shaped oddity that places 79,518 residents from what otherwise would be district 5 into district 6. The map replaces those voters by adding 80,245 residents from Ray, Lafayette, and Saline counties (or 73,731 residents from a portion of Clay County) to district 5.

**Figure 1**
Districts 5 and 6
in HB 193.

The per curiam justifies its decision without articulating a clear and definite test for the enforcement of article III, section 45 and refuses to analyze the evidence below, despite appellants' against-the-weight-of-the-evidence challenge. I dissent.

## II. Evidence at Trial

Two types of evidence were presented to the trial court. There was both stipulated evidence and opinion testimony. The parties stipulated to the HB 193 redistricting plan, its representative form ("the Map"), a number of alternative maps, population and demographic statistics, and statistical measurements of compactness.

**Figure 2**
HB 193

The Map, shown above, is composed of eight districts. All of the districts are composed of contiguous territory and are roughly equal in population.

On the western side of Missouri, the Map carves out a portion of the Kansas City suburbs in Jackson County and places it in district 6, creating a bizarre shape

referred to by the parties as the "teardrop." The northwestern corner of district 5 crawls up to bite off the southwestern corner of Clay County. The boundary then dives down to scoop out a portion of Jackson County, which becomes part of district 6. District 5 continues to reach out to the north and east, almost to mid-Missouri, to add the rural counties of Ray, Lafayette, and Saline, creating an L-shaped district extending across the state. The width of district 5 between the lowest dip of the teardrop and the southernmost border of the district is so narrow that it almost breaks the district's contiguity. The population of the teardrop area (i.e., the number of voters scooped from district 5 and deposited into district 6) is 79,518. Ray, Lafayette, and Saline counties add 80,245 to the population of district 5. District 5 also gains a population of 73,731 by extending its northern border into Clay County.

Demographically, 22 percent of district 5's population is African–American. Less than 4 percent of district 6's population is African–American, and 4.6 percent of district 4's population is African–American.

Each of Plaintiffs' proposed alternative maps, shown below, also divides Missouri into eight congressional districts:

**Figure 3**
Pearson Alternative
Map 2

**Figure 4**
McClatchey
Alternative Map

The statistics admitted with the alternative maps show that each proposed district is equal in population. A visual inspection of the maps demonstrates that each proposed district is contiguous and compact.[1] None have the same teardrop-shaped carve-out as HB 193.

As for the opinion evidence, the parties called two witnesses to testify and to interpret the statistical scores of compactness tests. Plaintiffs called David C. Kimball, Ph.D. He testified that, in his opinion, "the HB 193 map is not as compact as may be," citing the teardrop shape carved out of district 5. Dr. Kimball analyzed each map's scores on the compactness tests and compared HB 193 with the alternative maps, on both a map-wide basis and between individual districts. He said that Pearson Alternative 2 scored as more compact than the HB 193 Map on seven of eight statistical measures of compactness in a map-wide comparison. Similarly, the proposed district 5 in both the Pearson Alternative 2 map and McClatchey Alternative map scored as more compact on all eight measures than the HB 193 Map's district 5.

Defendants called as an expert witness Thomas B. Hofeller, Ph.D. Dr. Hofeller testified that, in his expert opinion, the HB 193 Map and each of its districts are compact, although he stated that there is no professional consensus as to what constitutes compactness. He did opine that a hypothetical noncompact district "would have significant indentations and protrusions."

Although he admitted that he had not conducted any exhaustive study, Dr. Hofeller stated that if HB 193 were invalidated, it would "be the most compact map ever invalidated by any court in America." When asked for the basis of this statement, Dr. Hofeller replied that he knew of no Missouri maps ever to be adjudicated noncompact.[2]

Dr. Hofeller testified that different states' districts are unlikely to achieve comparable degrees of compactness, but nevertheless compared HB 193 with districting maps from other states and testified that HB 193 was more compact. Although he compared HB 193 to 10 other states' maps, Dr. Hofeller never opined as to whether the comparison districts would be considered "compact as may be" under Missouri law.[3]

Finally, Dr. Hofeller also interpreted the statistical evidence from the compactness tests. Comparing HB 193 with Pearson Alternative 2 on a map-wide basis, Dr. Hofeller admitted the alternative scored better on seven of eight statistical measures but said that none of the differences were significant. Analyzing district 5 separately, Dr. Hofeller testified that the McClatchey Alternative district 5 scored as more compact than the HB 193 Map's district 5 on all eight tests. For all eight

---

1. In all three maps, the eastern appendages to district 3 that resemble a "lobster claw" clamping down on districts 1 and 2 are non-compact in shape. However, the evidence before the trial court showed that this non-compactness was necessary to comply with the federal Voting Rights Act. District 3, therefore, was "compact ... as may be." *See infra* Part III.

2. In fact, Missouri has adjudicated at least nine districts to be noncompact. *State ex rel. Barrett v. Hitchcock*, 241 Mo. 433, 146 S.W. 40 (1912); *Preisler v. Kirkpatrick*, 528 S.W.2d 422, 425–27 (Mo. banc 1975). *See* discussion in Part V.

3. One state to which he compared the Map—Maryland—had no compactness requirement at all. While the other states selected for comparison did have legal compactness standards, there was no evidence of exactly what these legal standards required or if they were similar to Missouri's constitutional requirement.

statistical measures of compactness, the differences were significant.

Dr. Hofeller gave no explanation for the shape of HB 193's district 5. No other evidence was presented regarding the shape of district 5.

At the end of the trial, the trial court ruled that "the Plaintiffs have failed to prove that HB 193 is unconstitutional because it is not 'as compact as may be.'" Appellants attack this judgment as against the weight of the evidence.

### III. Missouri Compactness Law: *Pearson I* and *Johnson*

This Court in *Pearson I* construed article III, section 45:

> the applicable standard of review for a court in reviewing an article III, section 45 claim is the language of the constitution itself: whether the General Assembly divided Missouri into districts of "contiguous territory as compact and as nearly equal in population as may be." As long as the districts comply with these constitutional requirements, the circuit court shall respect the political determinations of the General Assembly and allow for minimal and practical deviations required to preserve the integrity of the existing lines of our various political subdivisions.

359 S.W.3d at 40 (citation omitted).

In *Pearson I*, this Court held that the constitutional provisions are mandatory and objective. *Id.* The Court also recognized that the legislature may exercise discretion when redistricting, so long as constitutional commands are followed. *Id.* *Pearson I*, however, reiterated that the constitutional question is separate from any inquiry into the minds of the legislature or any analysis as to the exercise of legislative discretion. The reason is simple: Article III, section 45 was enacted "to guard, as far as practicable, under the system of representation adopted, against a legislative evil commonly known as 'gerrymander,'...." *Id.* at 38 (*quoting Barrett,* 146 S.W. at 61). The constitution, thus, "require[s] the Legislature to form districts, not only of contiguous, but of compact or closely united, territory." *Id.* (*quoting Barrett,* 146 S.W. at 61).

The constitution must be interpreted to comport with the intent of its drafters. *Keller v. Marion Cnty. Ambulance Dist.,* 820 S.W.2d 301, 302 (Mo. banc 1991). "Had the framers of the Constitution intended that the Legislature should apportion the state into districts according to its own free and untrammeled will, then they would not have used the words of restriction...." *Barrett,* 146 S.W. at 54. Discretionary factors cannot be read into the constitutional fabric if doing so would functionally erase the requirement that districts be compact. *See Buechner v. Bond,* 650 S.W.2d 611, 613 (Mo. banc 1983) ("[E]very word in a constitutional provision is assumed to have effect and meaning; their use is not mere surplusage.").

The majority today cites to dicta from *Johnson v. State,* 366 S.W.3d 11 (handed down concurrently), for the proposition that the legislature may draw districts whose constitutional validity is gauged according to the presence of "other recognized factors." It states that these nonconstitutional factors may include natural and historic boundary lines and population density. *See Johnson* at 29–30. But neither *Johnson* nor the per curiam here explain how the use of such discretionary factors can be squared with the objective constitutional standard set out in *Pearson I*. The folly of the dicta stated in *Johnson* is fully set out in the concurring opinion there and need not be restated here.[4]

Administering the rule espoused by the majority will be nearly impossible. The majority never defines any of the factors it announces or how they relate to Plaintiffs' burden. Specifically, the majority never articulates how factors like "population density" or "historical boundaries" apply to the requirement of compactness or population equality. The majority would allow a reviewing court to examine a map for any "traditionally recognized," but not identified, feature that plausibly might justify its form, and the majority apparently requires Plaintiffs to disprove every possible unidentified feature as part of their case-in-chief.[5] As is the case here, the result will be to functionally insulate any map from objective review. *Pearson I* abandoned a subjective inquiry that gave substantial deference to the legislature in favor of an objective standard. Here, the majority abandons the Court's role as arbiter of constitutional validity in favor of complete deference to the legislature for any number of unspecified, undefined, discretionary factors. The majority opinion effectively makes a compactness challenge nonjusticiable and abdicates this Court's duty to review article III, section 45, in derogation of Missouri law. *See Pearson I*, 359 S.W.3d at 39.[6]

The per curiam opinion confuses legislative discretion in its reasons for redrawing district lines with the article III, section 45 constitutional requirements that limit the legislature's discretion. When redistricting, the legislature may consider factors like those proposed by the majority, such as natural and historic boundaries, population density, or other "traditionally recognized factors." However, these do not make the map "compact as may be" and, thus, constitutionally compliant. Rather, such a map is "compact as may be" only where federal law or other requirements

---

**4.** In *Pearson I,* this Court articulated the legal standard for compactness challenges then remanded for the parties to present evidence in accordance with that standard. Neither the trial court nor the parties had any discretion to vary from this Court's directions on remand. *See Feinstein v. McGuire,* 312 S.W.2d 20, 24 (Mo.1958) (*citing Murphy v. Barron,* 286 Mo. 390, 228 S.W. 492, 494 (1920)). The per curiam opinion now attempts to change the rules after the game has been played by introducing "other recognized factors" as additional elements of Plaintiffs' case.

At the very least, the Court should remand the case to afford Plaintiffs a fair opportunity to present evidence under the latest standard. *See State ex rel. Div. of Family Servs. v. Standridge,* 676 S.W.2d 513, 517 (Mo. banc 1984) ("The furtherance of justice requires a case shall not be reversed without remanding unless the appellate court is convinced the facts are such that a recovery cannot be had.").

**5.** As the concurring opinion in *Johnson* explains, it would make more sense to place the burden on the state to raise "other factors" as defenses. *See Johnson,* (Price, J., concurring), at 39. This has been the approach of the United States Supreme Court. *See Karcher v. Daggett,* 462 U.S. 725, 741, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983).

**6.** The majority leaves unexamined the effect that its construction will have on equal population challenges, despite the application of "as may be" to article III, section 45's compactness and population equality requirements. The arguments against the majority's construction apply with all the more force when turned to equality of population. The majority does not, because it cannot, explain how historic boundary lines (or any other "recognized factor") magically make two unequally populated districts constitutional. *Cf. Kirkpatrick v. Preisler,* 394 U.S. 526, 533–34, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969) ("Missouri contends that variances were necessary to avoid fragmenting areas with distinct economic and social interests.... But to accept population variances, large or small, in order to create districts with specific interest orientations is antithetical to the basic premise of the constitutional command to provide equal representation for equal numbers of people.").

enumerated in Missouri's Constitution—contiguity and equality in population—necessitate a minimal degree of noncompactness. *See Pearson I,* 359 S.W.3d at 38 ("The provision requiring compactness of territory, *subject as it must be, to other more definitely expressed rules,* may also, in application, be modified by the requirement of equality in population....").

*Pearson I* did recognize the importance of preserving county boundaries where possible: "As long as the districts comply with these constitutional requirements, the circuit court shall ... allow for minimal and practical deviations required to preserve the integrity of the existing lines of our various political subdivisions." *Id.* at 40. Where, however, a nonpartial and objective observer can plainly see that a district is noncompact, deviations from compactness are not minimal. *See id.* (finding the compactness of district 5 to be "particularly suspect, as can be confirmed by any rational and objective consideration of [its] boundaries."). Here, the deviations from compactness result in the breach of major political subdivisions rather than the preservation of boundary lines.

## IV. Against the Weight of the Evidence Challenge

Even under the new "standard" articulated by the per curiam opinion, the trial court judgment must be analyzed to see if it is against the weight of the evidence. The per curiam opinion attempts to sidestep its responsibility to weigh the evidence in two ways. First, it exaggerates how rarely Missouri appellate courts reverse judgments as against the weight of the evidence. Second, the per curiam opinion asserts that, because Plaintiffs had the burden of proof, they automatically lose their against the weight of the evidence challenge. Neither argument justifies the per curiam opinion's failure to weigh the evidence.

"Against the weight of the evidence" is an appellate standard of review that has been in use in Missouri for more than a century. *See, e.g., Moore v. Moore,* 4 Mo. 421, 423 (1836); *J. & W. McDowell v. Shields & Bolton,* 12 Mo. 441, 442 (1849). *Murphy v. Carron* affirmed the use of this standard 35 years ago. On appeal from a judgment in a bench-tried case, "the decree or judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, *unless it is against the weight of the evidence,* unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976) (emphasis added). This Court must look at each piece of evidence, weigh the probative value of that evidence, and determine whether the trial court judgment should stand.

The majority claims that appellate courts "rarely" reverse trial court judgments for being against the weight of the evidence. But reported cases show that reversal on this ground occurs regularly.[7]

7. *See, e.g., Searcy v. Seedorff,* 8 S.W.3d 113, 115 (Mo. banc 1999); *Buckner v. Jordan,* 952 S.W.2d 710, 712 (Mo. banc 1997); *Grossman v. St. John,* 323 S.W.3d 831, 834–35 (Mo.App. W.D.2010); *Martha's Hands, LLC v. Rothman,* 328 S.W.3d 474, 482 (Mo.App. E.D.2010); *Sullins v. Knierim,* 308 S.W.3d 241, 248 (Mo. App. E.D.2010); *Glenstone Block Co. v. Pebworth,* 330 S.W.3d 98, 103 (Mo.App. S.D. 2010); *In re D.O.,* 315 S.W.3d 406, 408 (Mo. App. S.D.2010); *Andrews v. Andrews,* 290 S.W.3d 783, 788 (Mo.App. E.D.2009); *Wightman v. Wightman,* 295 S.W.3d 183, 187 (Mo. App. E.D.2009); *West v. Dir. of Revenue,* 297 S.W.3d 648, 650 (Mo.App. S.D.2009) (before Scott, C.J., Lynch, P.J., and Rahmeyer, J.); *Rozier v. Dir. of Revenue,* 272 S.W.3d 262, 266 (Mo.App. W.D.2008); *Martin v. Dir. of Revenue,* 248 S.W.3d 685, 689 (Mo.App. W.D. 2008); *Viacom Outdoor, Inc. v. Taouil,* 254 S.W.3d 234, 238 (Mo.App. E.D.2008); *Davis v. Schmidt,* 210 S.W.3d 494, 518 (Mo.App.

More to the point, the frequency of reversals is irrelevant to the outcome of any particular case, because a court's decision to reverse or affirm necessarily depends

W.D.2007); *In re R.M.*, 234 S.W.3d 619, 625 (Mo.App. E.D.2007); *Swartz v. Johnson*, 192 S.W.3d 752, 755 (Mo.App. W.D.2006); *Manager of Div. of Fin. of Jackson Cnty. v. La–Sha Consulting, Inc.*, 224 S.W.3d 605, 607 (Mo. App. W.D.2006) (before Newton, P.J., Breckenridge and Ellis, JJ.); *Huskey v. Dir. of Revenue*, 183 S.W.3d 628, 629 (Mo.App. S.D.2006) (before Raymeyer, P.J., Parrish and Lynch, JJ.); *Pride v. Lewis*, 179 S.W.3d 375, 377 (Mo.App. W.D.2005) (before Ulrich, P.J., Breckenridge and Smart, JJ.); *Doerhoff v. Salmons*, 162 S.W.3d 498, 502–03 (Mo.App. W.D.2005) (before Holliger, P.J., Breckenridge and Ellis, JJ.); *Mahoney v. Mahoney*, 162 S.W.3d 512, 516–17 (Mo.App. W.D.2005); *Campbell v. Dir. of Revenue*, 172 S.W.3d 476, 477 (Mo.App. E.D.2005); *Callanan v. Dir. of Revenue*, 163 S.W.3d 509, 512–15 (Mo.App. E.D.2005); *Tarneja v. Tarneja*, 164 S.W.3d 555, 564 (Mo.App. S.D.2005); *Garrison v. Garrison*, 147 S.W.3d 925, 930 (Mo.App. W.D. 2004); *Shirkey v. Guar. Trust Life & Ins. Co.*, 141 S.W.3d 62, 69 (Mo.App. W.D.2004); *Newsham v. Dir. of Revenue*, 142 S.W.3d 207, 208 (Mo.App. E.D.2004); *Lumsden v. Dir. of Revenue*, 136 S.W.3d 95, 98 (Mo.App. E.D. 2004); *TA Realty Assoc. Fund V, L.P. v. NCNB 1500, Inc.*, 144 S.W.3d 343, 348 (Mo.App. E.D.2004); *Clark v. Dir. of Revenue*, 132 S.W.3d 272, 279 (Mo.App. S.D.2004); *Emig ex rel. Emig v. Curtis*, 117 S.W.3d 174, 182 (Mo.App. W.D.2003); *Singleton v. State*, 120 S.W.3d 218, 224 (Mo.App. W.D.2003) (before Hardwick, P.J., Breckenridge and Spinden, JJ.); *Hockman v. Dir. of Revenue*, 103 S.W.3d 382, 383 (Mo.App. W.D.2003); *Dean Machinery Co. v. Union Bank*, 106 S.W.3d 510, 523 (Mo.App. W.D.2003); *Kauffman v. Kauffman*, 101 S.W.3d 35, 44 (Mo.App. W.D.2003) (Breckenridge, P.J.); *In re Coffel*, 117 S.W.3d 116, 117 (Mo.App. E.D.2003); *In re B.C.K.*, 103 S.W.3d 319, 321 (Mo.App. S.D.2003); *Edmisten v. Dir. of Revenue*, 92 S.W.3d 270, 275 (Mo.App. W.D.2002); *Wright v. Fisher*, 89 S.W.3d 548, 550 (Mo.App. W.D.2002); *Austin v. Pickett*, 87 S.W.3d 343, 345 (Mo.App. W.D. 2002); *Baxley v. Jarred*, 91 S.W.3d 192, 206 (Mo.App. W.D.2002); *Innis v. Dir. of Revenue*, 83 S.W.3d 691, 696 (Mo.App. W.D.2002) (before Breckenridge, P.J., Howard and Holliger, JJ.); *Smith v. Dir. of Revenue*, 77 S.W.3d 120, 126 (Mo.App. W.D.2002); *Hall v. Dir. of Revenue*, 72 S.W.3d 231, 233 (Mo.App. E.D.2002);

*Bradford v. Dir. of Revenue*, 72 S.W.3d 611, 614 (Mo.App. E.D.2002); *Burk v. Dir. of Revenue*, 71 S.W.3d 686, 688 (Mo.App. S.D.2002); *Boyd v. Dir. of Revenue*, 71 S.W.3d 262, 267 (Mo.App. S.D.2002); *Matthews v. Dir. of Revenue*, 72 S.W.3d 175, 177–80 (Mo.App. S.D. 2002); *Dechant v. Saaman Corp.*, 63 S.W.3d 293, 294 (Mo.App. E.D.2001); *Baker v. Baker*, 60 S.W.3d 19, 24 (Mo.App. E.D.2001); *Bollinger v. Dir. of Revenue*, 39 S.W.3d 64, 66 (Mo.App. E.D.2001); *Unmelman v. Dir. of Revenue*, 59 S.W.3d 651, 653–54 (Mo.App. S.D.2001); *In re Marriage of Eikermann*, 48 S.W.3d 605, 612 (Mo.App. S.D.2001); *In re Marriage of Pahlow*, 39 S.W.3d 87, 98 (Mo. App. S.D.2001); *Turrell v. Missouri Dept. of Revenue*, 32 S.W.3d 655, 658 (Mo.App. W.D. 2000) (before Holliger, P.J., Breckenridge and Smart, JJ.); *Rhodus v. McKinley*, 16 S.W.3d 615, 619 (Mo.App. W.D.2000) (before Spinden, J., and Breckenridge, P.J.); *Flynn v. Flynn,* 34 S.W.3d 209, 210–12 (Mo.App. E.D. 2000); *In re D.L.M.*, 31 S.W.3d 64, 65 (Mo. App. E.D.2000); *Dillon v. Dir. of Revenue*, 999 S.W.2d 319, 320 (Mo.App. W.D.1999) (Breckenridge, C.J.); *In re M.F.*, 1 S.W.3d 524, 528 (Mo.App. W.D.1999) (Breckenridge, C.J.); *Buschardt v. Jones*, 998 S.W.2d 791, 801 (Mo. App. W.D.1999) (Breckenridge, C.J.); *Williams v. Williams*, 11 S.W.3d 728, 729–30 (Mo.App. W.D.1999) (before Breckenridge, P.J., Ellis and Spinden, JJ.); *Bescheinen v. Dir. of Revenue*, 999 S.W.2d 324, 324 (Mo. App. W.D.1999); *Hawkins v. Dir. of Revenue*, 7 S.W.3d 549, 552 (Mo.App. E.D.1999); *Meurer v. Dir. of Revenue*, 984 S.W.2d 873, 878 (Mo.App. E.D.1999); *Selix v. Dir. of Revenue*, 985 S.W.2d 380, 384 (Mo.App. E.D. 1999); *Welch v. Dir. of Revenue*, 2 S.W.3d 142, 143 (Mo.App. S.D.1999); *Newsom v. Newsom*, 976 S.W.2d 33, 34 (Mo.App. W.D. 1998) (Breckenridge, P.J.); *Sprouse v. Sprouse*, 969 S.W.2d 836, 838 (Mo.App. W.D. 1998); *Tate v. Dir. of Revenue*, 982 S.W.2d 724, 729 (Mo.App. E.D.1998); *Ironite Prod. Co. v. Samuels*, 985 S.W.2d 858, 861–62 (Mo. App. E.D.1998); *Helton v. Dir. of Revenue*, 944 S.W.2d 306, 307 (Mo.App. W.D.1997); *Dover v. Dover*, 930 S.W.2d 491, 496 (Mo.App. W.D.1996) (Breckenridge, J.); *Christian Disposal, Inc. v. Village of Eolia*, 895 S.W.2d 632, 633–34 (Mo.App. E.D.1995); *Hatfield v. Dir. of Revenue*, 907 S.W.2d 207, 208 (Mo.App. S.D.1995).

on a careful and detailed examination of the facts of each case.

The argument that Plaintiffs should automatically lose their against the weight of the evidence challenge because they bore the burden of proof also misses the mark. This Court does not "refuse" to weigh the evidence when a party bearing the burden of proof in a case raises that point. The majority cites *State Farm Mut. Auto. Ins. Co. v. Allen*, 744 S.W.2d 782, 786–87 (Mo. banc 1988), for this proposition, but that case did not announce such a rule. Rather, the *State Farm* Court weighed the evidence and decided that the trial court judgment was not against the weight. That the trial court's judgment had been for the defendant did not figure into the analysis.

The result of an against the weight of the evidence challenge depends on what evidence was before the trial court. Citing *White v. Director of Revenue*, 321 S.W.3d 298 (Mo. banc 2010), the per curiam opinion argues that the lack of factual findings at the trial court level prevents this Court from reviewing the weight of the evidence. "[W]hen there are no factual findings, the evidence shall be considered as having been found in accordance with the result reached." *Id.* at 305 (quotation marks omitted). But *White* also holds that "when the evidence is *uncontested* no deference is due to the trial court's findings. Then, the issue is legal and there is no finding of fact to which to defer." *Id.* at 307 (citations omitted). Here, all the material facts were stipulated and, thus, uncontested. Consequently, lack of factual findings does not short-circuit this Court's review of the weight of the evidence.

## V. The Trial Court Judgment is Against the Weight of the Evidence

Utilizing the above principles and weighing the probative value of the evidence before the trial court, the trial court's judgment in favor of Defendants was against the weight of the evidence. The probative evidence tending to show district 5 is not compact weighs in favor of finding for Plaintiffs. Most importantly, the stipulated Map shows the bizarrely shaped districts of 5 and 6 because of the teardrop-shaped carve-out. The borders of the district are not only visually jarring; they also divide communities. The teardrop splits Jackson County between districts 5 and 6; the teardrop also tears apart the cities of Blue Springs, Independence, Lee's Summit, and Oak Grove, placing pieces of each community into both districts.

The stipulated population numbers and the inferences from the Map also show that the districts are not compact. The teardrop removes 79,518 people from Jackson County, which otherwise would be district 5, and places them in district 6. The Map then replaces those people by adding 80,245 citizens from Ray, Lafayette, and Saline counties. District 5 also absorbs 73,731 people from the southwestern corner of Clay County. The displacement of more than 150,000 Missouri voters from two otherwise-compact voting districts cannot be swept under the rug as a "minimal and practical deviation" from compactness. *See Pearson I*, 359 S.W.3d at 40.

Plaintiffs introduced alternative maps that show Missouri can be divided into eight districts that are significantly more compact while still respecting the mandatory principles of contiguity, equal population, and compliance with federal laws. These alternative maps did not have carve-outs as egregious as that in district 5 of the Map. These maps are highly probative evidence of the noncompactness of the HB 193 Map.

Both parties stipulated to the admission of each map's scores on eight compactness

tests. Although both Plaintiffs' and Defendants' witnesses testified that no one statistical measure can be a reliable indicator of compactness, both parties' witnesses still interpreted the scores for the trial court and generally found that the alternative maps scored as "more compact" than HB 193 Map on both map-wide and individual district compactness tests. Notably, it was Defendants' expert who stated that district 5 from the McClatchey Alternative Map scored as more compact than HB 193's district 5 on all eight measures of compactness—and the differences in scores were *significant.*

In contrast, there is little probative evidence that supports finding the Map compact. There was no evidence, testimonial or otherwise, that explained the shapes of districts 5 and 6 as they appear in the Map.[8] There was no evidence showing that dividing Blue Springs, Independence, and other Jackson County communities between two districts made the Map more compact. There was no evidence explaining the removal of almost 80,000 people from the center of Jackson County, in what would otherwise be district 5. No evidence explained why roughly 80,000 citizens from Ray, Lafayette, and Saline counties should be tacked on to the rest of the district. There was no evidence explaining why more than 73,000 citizens of southwestern Clay County should join the rest of Jackson County in district 5. Because there is no evidence relating to this point, obviously there can be no weight assigned to it.

Evidence presented at trial also included historic district boundary lines from prior districting maps. *See* per curiam Appendix A. The majority believes districting maps from every decade since the 1920s serve as evidence of prior boundary lines on which the legislature may have relied in drawing HB 193. The per curiam notes that the 1992 map created a "downward protrusion" in district 5 that remained in the 2002 map. However, these prior maps are not compelling. First, the protrusion created in 1992 is not in the same location and is not the same shape as the egregious teardrop carve-out that divides Jackson County in HB 193. Second, these maps were never adjudicated to be compact. A map that could be unconstitutional cannot be strong evidence to support finding another map constitutional, much less outweigh the rest of Plaintiffs' probative evidence.

Each party's expert witness also testified as to his personal opinion of the compactness of HB 193 Map. Plaintiffs' witness testified that the Map is not as compact as may be, citing the teardrop in district 5. Defendants' expert testified that the map was compact. Because the statements by the parties' witnesses were merely conclusionary statements of opinion and law, not fact, delving into an area that is in the sole province of the Court to determine, their opinions carry little weight.

Specifically weighing against the value of Dr. Hofeller's conclusion was his statement that if found invalid, HB 193 would be the most compact map ever adjudicated to be noncompact. As the basis for this statement, Dr. Hofeller said he knew of no map to ever be adjudicated noncompact in Missouri. To the contrary, this Court held several state senatorial districts to be noncompact in both *Barrett,* 146 S.W. 40, and *Kirkpatrick,* 528 S.W.2d 422. *Barrett* found eight districts to be noncompact.[9]

---

8. Compare, for example, the testimony explaining that district 3 is crescent-shaped because districts 1 and 2 must comply with the Voting Rights Act.

9. The *Barrett* Court held that the map's chal-

146 S.W. at 65. The eight noncompact districts are shown below:

**Figure 5**
Districts found to be noncompact in *Barrett*.

*Kirkpatrick* held two districts to be noncompact. 528 S.W.2d at 427.[10] Because district 33 in that map "thrusts a narrow appendage from the middle of its body into the heart of Greene County," the district was not "within acceptable limits of compactness." *Id.* See the 1975 map and 33rd district below:

lengers were barred from relief on procedural grounds not applicable here. *See Barrett*, 146 S.W. at 65–66.

**10.** *Kirkpatrick* did not hold the map as a whole noncompact because despite the problem with district 33 the map as a whole "substantially complied" with constitutional requirements. 528 S.W.2d at 427. In *Pearson I*, however, this Court said that the protection of article III, section 45 "applies to each Missouri voter, in every congressional district." *Pearson I*, 359 S.W.3d at 39.

**Figure 6**
Districts found to be noncompact in *Kirkpatrick*.

Compare districts 5 and 6, the congres- below:
sional districts at issue in this case, shown

**Figure 7**
Districts 5 and 6 in HB 193 Map

**Figure 8**
Detail of Districts 5 and 6 in HB 193.

After weighing the evidence before the trial court, the strong evidence in favor of non-compactness includes the Map itself (this includes the irregular boundaries of the districts, the division of cities between districts 5 and 6, and the unexplained inclusion and exclusion of citizens from Jackson, Clay, Ray, Lafayette, and Saline counties); the alternative maps; and any slight value of the statistical compactness test scores. Additionally, the teardrop distortion of districts 5 and 6 is worse than the distortions in the districts that this Court held to be noncompact in *Barrett* and *Kirkpatrick*.[11]

The only evidence that weighs in favor of finding the Map compact is Defendants' expert's testimony and the prior districting maps. The expert's testimony receives little weight because it was a mere statement of opinion and law. The prior districting maps are lacking in probative value because they are unadjudicated, meaning they may be unconstitutional themselves, and they do not exhibit districts of the same shape as those present in HB 193. Nor has the per curiam explained how those maps in any way justify the teardrop at issue here. The testimony and prior maps cannot outweigh the very strong evidence tending to show the Map is not compact.

Rather than weighing the evidence before the trial court or looking to previously adjudicated maps from *Barrett* and *Kirkpatrick*, the majority holds that Plaintiffs fail to show that the Map was not influenced by "other recognized factors." The per curiam believes Plaintiffs must prove the Map's noncompactness is not a "minimal or practical" deviation that occurs from the legislature taking into account "other recognized factors" such as "population density; natural boundary lines; the boundaries of political subdivisions, including counties, municipalities, and precincts; and the historical boundary lines of prior redistricting maps." Per curiam op. at 50, 53.

11. This case is unique because any observer can look at the shape of districts 5 and 6, and at the shape of prior districts adjudicated to be noncompact, and determine that the teardrop extension/carve-out destroys the compactness of these two districts.

Under the guise of "weighing the evidence," the majority finds Plaintiffs' failure to put on evidence of these factors means Plaintiffs receive a score of zero and Defendants automatically win. One only has to look so far as to the purported analysis in the per curiam opinion to see that "other recognized factors" is a term so flexible and vague as to allow any evidence to be presented—and to allow the majority to assign that evidence any amount of weight it desires.

The majority does not define what the factors mean or how they relate to a plaintiff's burden in a compactness challenge. Take, for example, the majority's application of the "other recognized factor" of population density. Immediately after noting that compactness test scores fall on a continuum and that no one score may determine a district is "compact," the majority states that "[d]istrict 5 scored *well* on the measures of compactness that consider area in combination with population." Op. at 56 (emphasis added). The majority then states Plaintiffs presented no other evidence regarding "population density" and its alleged effect on the shape of district 5.

Multiple problems arise from the majority's assessment of this "evidence." First, this Court cannot determine that district 5 scored "well" when even experts cannot state what constitutes a good score on the compactness test. Second, the majority never defines what "population density" means in relation to compactness of districts and Plaintiffs' burden. Third, the majority provides no instruction as to what other evidence Plaintiffs could or should submit relating to population density. Finally, there is no evidence that the General Assembly considered "population density" (or "historical boundary lines;" see below) in drawing the map, or how such a subjective consideration could factor into an objective standard of review.

The majority fails to provide a definition or other guidance as to the factor "historical boundary lines" as well. Although neither the parties nor the drafters of the Map provided evidence as to the reasons for its borders, the majority finds there "was evidence" disputing whether the boundaries of district 5 were affected by "historical district boundaries." The majority says this Map "only slightly expands [the] carved out portion" of a protrusion in Jackson County in the 2002 map. But it is illogical for "historical district boundaries" to have constitutional signification if a new map *changes* those old boundaries. Further, the majority does not address how different boundary lines in a new map can be for it no longer to be influenced by the factor of historical boundary lines. Additionally, just because there "was evidence" as to the existence of historical maps does not establish that the evidence was probative or even relevant.

An overarching problem is that the majority does not even require the "other recognized factors" to be uniformly applied across the state. This is apparent when the per curiam assesses the influence of the factor of "political subdivision boundaries" on the Map. The majority cites one consideration—keeping municipalities north of the Missouri River together—to explain district 5's protrusion northward into Clay County, but does not discuss the teardrop dividing Blue Springs, Independence, Lee's Summit, and Oak Grove. Then the majority cites a completely different factor—following historical district boundary lines—for the teardrop shape carved out of Jackson County without describing why, in this instance, it should be given preference over keeping Jackson County in one voting district. To arbitrarily choose to consider one nonconstitutional factor in one instance, ignore it in another instance, and then apply a differ-

ent nonconstitutional factor in a third instance is beyond any rational explanation.

## VI. Conclusion

Article III, section 45 guarantees the right of Missouri voters to fairly structured voting districts for the election of their United States representatives. Rights safeguarding fair elections are of the utmost importance in any democracy. Abstract discussion of law cannot mask the obvious fact that the legislature has attempted to gerrymander a teardrop-shaped portion of Jackson County from district 5 and place it in district 6. Article III, section 45 is simply and clearly written. It should be enforced, not finessed in deference to an obvious legislative shenanigan. The judgment of the trial court should be reversed.

