

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| KRISTI E. BROWN, ET UX., | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | WD85926 |
| v. | ) | |
| | ) | OPINION FILED: |
| ELISA R. PFEIFFER, | ) | JANUARY 2, 2024 |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Clay County, Missouri**
**The Honorable Timothy J. Flook, Judge**

**Before Division One: Edward R. Ardini, Jr., Presiding Judge,**
**Anthony Rex Gabbert, Judge, Janet Sutton, Judge**

Elisa R. Pfeiffer ("Pfeiffer") appeals the circuit court's judgment on Kristi E.

Brown's ("Kristi")[1] and Kenneth A. Brown's ("the Browns" collectively) Second

Amended Petition for partition and breach of contract. Pfeiffer contends the circuit court,

1) misapplied the law in finding the parties entered into two valid and enforceable

agreements, and 2) erred in finding the reasonable fair rental value of the Clay County

property to be $1,600.00 per month. We affirm.

---

[1] As several individuals who are a party to this action share the same last name, Kristi Brown
will be referenced by her first name. No disrespect or familiarity is intended.

## Background and Procedural Information

The Browns filed a Petition for Partition against Pfeiffer on February 23, 2021. Pfeiffer filed an answer and two-count counterclaim on March 23, 2021, adding Garth Brown as a defendant in Count I of the counterclaim along with the Browns.

The Browns filed a Second Amended Petition on March 8, 2022, alleging that the Browns and Pfeiffer each owned undivided, one-half interests in two properties. One property, which included a house, was located in Kearney, Missouri ("Kearney property"). This was obtained by Kristi and Pfeiffer through a Beneficiary Deed from Margaret P. Pfeiffer, who died August 20, 2020. It was held by Kristi and Pfeiffer as tenants in common. The other property consisted of land located in Sullivan County, Missouri ("Sullivan County property"). The Browns and Kristi each owned undivided, one-half interests in the Sullivan County property as joint tenants.

"Count I - For Partition" alleged that Pfeiffer had occupied the Kearney property since August 20, 2020, and had changed the locks and prevented Kristi's entry. Further, that Pfeiffer was making modifications to the home without Kristi's approval. Kristi alleged that, as a tenant in common, Kristi was entitled to one-half of the fair rental value of the house during any time it was occupied, which Kristi believed to be $800.00 per month. Kristi alleged that, for more than eighteen months, Pfeiffer had refused to pay Kristi her portion of the fair rental value for occupying the home.

Count I additionally alleged that, due to the varying character, uses, value, and locations of the Kearney property versus the Sullivan property, partition in kind was not

possible without great prejudice to the owners. Kristi, therefore, sought partition of the Kearney property for the common benefit of the parties. Kristi requested appraisal of the Kearney property to determine the fair market value, partition through sale of the home, with Pfeiffer to provide an accounting of any expenses incurred in maintaining the home and any improvements since August 20, 2020.

Count I further requested partition by sale of the Sullivan County property via the Sullivan County Sheriff selling the property on the steps of the Sullivan County Courthouse. Further, that the court determine Pfeiffer's and the Browns' respective shares of the proceeds of the two partition sales, adjusted to account for rents owed and reasonable expenses paid by Pfeiffer for maintenance and improvement. Additionally, that the Browns be granted reasonable attorneys' fees expended in pursuing the action, taxed with the costs of the action, and deducted from the sale proceeds before distribution of the adjusted shares of the proceeds.

"Count II – Breach of Contract" alleged that on January 21, 2022, and January 22, 2022, in an effort to resolve the primary issues in the case, Kristi and Pfeiffer signed an agreement regarding the sale of the Kearney property located in Clay County ("Clay Agreement"). Further, that an agreement was signed on those same dates regarding the Sullivan County property ("Sullivan Agreement") and Pfeiffer was represented by counsel at the time of the agreements.

Count II alleged that, in the Clay Agreement, Pfeiffer agreed to state a price for one-half of which (less one-half of title insurance costs) she would be willing to either

3

buy Kristi's one-half interest in the Kearney home, or sell her own one-half interest to Kristi. Pfeiffer, in writing and via counsel, then placed a monetary value on the property of $100,000. Kristi, in writing and via counsel, agreed to pay half of that monetary value to Pfeiffer to purchase the property. Under the terms of the Clay Agreement, closing was to occur on or before February 22, 2022. Pfeiffer chose Stewart Title for the place of closing.

In the Sullivan Agreement, the Browns agreed to state a price for one-half of which (less one-half of title insurance costs) the Browns would be willing to either buy Pfeiffer's one-half interest in the Sullivan County property, or sell the Browns' one-half interest to Pfeiffer. The Browns valued the Sullivan County property at $34,000. Pfeiffer was obligated to advise the Browns on or before March 18, 2022, whether Pfeiffer chose to buy the Browns' one-half interest in the Sullivan County property, or sell her own one-half interest to the Browns.

Count II additionally alleged that, on or before February 18, 2022, Pfeiffer expressed that she did not intend to close on the sale of the Kearney property pursuant to the Clay Agreement. Further, that Pfeiffer did not intend to decide whether to buy or sell the Sullivan County property under the Sullivan Agreement. On February 18, 2022, when performance was due on the Sullivan Agreement, Pfeiffer failed to advise Brown of her decision to buy or sell the Sullivan County property. On February 22, 2022, when performance was due under the Clay Agreement, Pfeiffer failed to appear for the closing.

4

Count II further alleged that, because the real estate at issue was unique, and damages insufficient to compensate the Browns for Pfeiffer's breaches, specific performance was warranted. Further, under both the Clay Agreement and Sullivan Agreement, if litigation became necessary to enforce the terms of the agreements, the prevailing party was to recover from the non-prevailing party their reasonable costs and attorneys' fees. The Browns alleged that they had incurred significant attorneys' fees in attempting to compel Pfeiffer to perform as promised in the Clay and Sullivan agreements.

The Browns asked the court to find Pfeiffer had breached both the Clay Agreement and the Sullivan Agreement, set a date, time, and place for closing of the two agreements, and order Pfeiffer's specific performance under the two agreements. Further, that the Browns' costs and attorneys' fees be withheld from Pfeiffer's portion of the proceeds and given to the Browns.

On March 18, 2022, the Browns filed a Motion to Enforce Partial Settlement. The motion alleged that, in consideration of the Clay and Sullivan agreements, the Browns had ceased discovery and trial preparation efforts directed toward the real estate partition elements of the petition, on which trial was scheduled April 1, 2022. Further, that on March 17, 2022, Pfeiffer repudiated the agreements in their entirety, stating that neither was enforceable. The Browns asked for specific performance of the agreements.

On April 11, 2022, Pfeiffer filed an Answer to the Browns' Second Amended Petition and Pfeiffer's opposition to the Browns' Motion to Enforce Partial Settlement.

Pfeiffer's answer included the same two-count counterclaim previously filed in response to the Browns' initial petition. Count I of the counterclaim alleged that Garth Brown and the Browns had illegally dumped construction debris and hazardous material on the Kearney property, resulting in damage to Pfeiffer.[2] Count II alleged that Pfeiffer had made payments on the mortgage on the Kearney property, payments on additional debts of Margaret Pfeiffer, and paid multiple expenses necessary to keep and maintain the Kearney property. Further, that Kristi agreed that if Pfeiffer would send her the payment book and bills, Kristi would take over payment of those debts. Pfeiffer alleged that Kristi failed to do so which led to payments becoming delinquent and foreclosure proceedings pursued, causing Pfeiffer to retain an attorney to halt that process. Pfeiffer asked the court to order that Kristi compensate Pfeiffer for damages.

The parties appeared on May 23, 2022, for bench trial, after bifurcation, on Count II of the Browns' Second Amended Petition. The trial evidence showed that in an effort to settle the bulk of the pending issues, Pfeiffer's counsel drafted the Clay Agreement and the Sullivan Agreement which were signed by the parties January 21 and 22, 2022. The two agreements follow the same structure: one party was to state a monetary value for the affected property, and the other had the option to either purchase the first party's one-half interest in the property for one-half the stated value, or sell their interest for one-half the stated value. Pfeiffer agreed to state the monetary value for the Kearney property, and

---

[2] Count I of Pfeiffer's counterclaim was dismissed without prejudice prior to trial.

6

Kristi had the option to buy or sell for one-half that value; the Browns agreed to state the monetary value for the Sullivan County property, and Pfeiffer had the option to buy or sell for one-half that value. Both parties were represented by counsel, and the agreements provided that the parties would communicate their choices via email through their attorneys.

Each agreement specified the date by which the other party was to place a monetary value on the property and advise the opposing party's attorney of that value via email, the date by which the party not pricing the property would advise via email to the other party's attorney if the property would be purchased or sold, and the date by which the property would be transferred. Each agreement reserved several issues for ongoing litigation, including Kristi's claim for rents from Pfeiffer during the time Pfeiffer had exclusive control of the Kearney property, Pfeiffer's claim for reimbursement of expenses, and Pfeiffer's and Kristi's claims for recovery of certain items of personal property. Both agreements provided that, in the event of litigation, the prevailing party would recover attorneys' fees.

Pfeiffer timely emailed the Browns' counsel that Pfeiffer valued the Kearney property at $100,000.00. The Browns' counsel timely emailed Pfeiffer's counsel that Kristi would exercise the option to purchase the property for one-half that price, and also advised that the Browns valued the Sullivan County property at $34,000. Pfeiffer requested that Stewart Title be used for closing on the Kearney property. Pfeiffer did not

7

advise as to her preference regarding the Sullivan County property, or follow through with finalizing the closing on either property.

On June 9, 2022, the circuit court entered Judgment, with amended Judgments issued July 12 and 13, 2022, following a motion to amend. The circuit court found that the parties had entered into two valid and enforceable settlement agreements. The parties agreed to terms to trigger respective obligations to purchase and sell the Kearney property and the Sullivan County property. The court found the terms of each settlement agreement sufficiently clear to be enforceable and that all conditions precedent to the performance of the parties' agreements had occurred.

The circuit court found that Pfeiffer had substantially and materially breached the parties' two agreements by failing to comply with the terms and her obligations therein. The court ordered Pfeiffer to specifically perform all obligations contained within both agreements.

With regard to the Kearney property, the court ordered Pfeiffer to appear on or before July 15, 2022, at Stewart Title in Liberty, Missouri to execute a Warranty Deed conveying to Kristi all of her right and title in and to the Kearney property, and execute all other closing documents usual and necessary to such a conveyance. The court ordered Kristi to appear on or before July 15, 2022, at Stewart title in Liberty, Missouri, to tender payment of $50,000.00, less one-half of related closing and title insurance costs, and execute all closing documents usual and necessary to the closing of the sale of the Kearney property.

With regard to the Sullivan County property, the court ordered that, within ten days after the Judgment, Pfeiffer advise the Browns, by email to the Browns' counsel of record, whether Pfeiffer wished to purchase the Browns' interest in the Sullivan County property for $17,000, less one-half of related closing and title insurance costs, or sell her own interest to the Browns on the same terms. Further, within thirty days after advising the Browns of Pfeiffer's decision, Pfeiffer was to appear at the offices of Stewart Title in Liberty, Missouri, execute all closing documents, and tender cash or a Warranty Deed as applicable.

The Browns were awarded attorneys' fees and costs in the sum of $6,814.20, which was to be deducted from the amount due Pfeiffer at the closing of the Kearney property and returned to the Browns.

On July 25, 2022, the Browns filed a "Motion for Order Vesting Title, and for Attorneys' Fees and Costs," alleging that Pfeiffer had failed to comply with the court's judgment and asking the court to enter judgment divesting Pfeiffer of title to the Kearney property, vesting title to Kristi, award attorneys' fees, and hold Pfeiffer in contempt.

On August 4, 2022, the parties appeared individually and with counsel on the Browns' Motion for Order Vesting Title. On August 5, 2022, the circuit court entered "Interlocutory Judgment Vesting Title" which found Pfeiffer in contempt concluding that, without just cause, Pfeiffer had failed and refused to appear for closing and perform as ordered by the court. The court ordered Pfeiffer divested of all right, title, and interest in

the Kearney property, and vested Kristi with undivided fee simple ownership of the property.

On October 21, 2022, the cause was called for trial on all remaining claims of the parties which included Kristi's claim for rents due under Count I of the Browns' Second Amended petition, the Browns' claim for attorneys' fees under Count II, and Pfeiffer's counterclaim for reimbursement for expenditures in relation to the properties.

On November 22, 2022, the circuit court entered a final Judgment addressing all remaining issues and incorporating its prior interlocutory judgments. In Kristi's Count I claim for unpaid rents regarding the Kearney property, the court found that Pfeiffer had exclusive possession, use and control of the property for a period of twenty-two months, with the reasonable fair market rental value during that time period being $1,600.00 per month, for a total rental value of $35,200.00. The court found Kristi, as co-tenant of the property, entitled to one-half that value for a sum of $17,600.00 in damages.

In the Brown's Count II claim for attorneys' fees, the court found the Browns the prevailing party of the disputes related to the contracts between the parties and, therefore, entitled to attorneys' fees under the contracts. The court awarded the Browns $2,835.85 in attorneys' fees caused by Pfeiffer's refusal to perform the real estate sale agreements and sale closings. The court declined to allow the Browns to recover interest on the purchase money loan related to the real estate closing and purchases.

On Pfeiffer's counterclaim for expenditures on the properties, the court found the Browns entitled to $2,557.54 from Pfeiffer in expenditures, Pfeiffer entitled to $2,728.20

10

from the Browns in expenditures, resulting in a balance of $60.96 owed to Pfeiffer by the Browns for expenditures. After offsetting the awards, the court concluded that Pfeiffer owed the Browns a total of $20,374.89. The court ordered the amount deducted from the sale proceeds of the property and that any balance thereafter accrue interest at a statutory rate of nine percent simple interest.

This appeal follows.

### Standard of Review

Our standard of review in any court-tried case is set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). *Schollmeyer v. Schollmeyer*, 393 S.W.3d 120, 122 (Mo. App. 2013). We will affirm the circuit court's judgment unless it is unsupported by substantial evidence, is against the weight of the evidence, or erroneously declares or applies the law. *Id.* at 122-123. We view the evidence and all reasonable inferences in the light most favorable to the court's judgment. *Id.* at 123. The party challenging the judgment has the burden of proving error. *Beckham v. Beckham*, 41 S.W.3d 908, 911 (Mo. App. 2001). We apply *de novo* review to questions of law and give no deference to the trial court's conclusions regarding such questions. *Pearson v. Koster*, 367 S.W.3d 36, 43-44 (Mo. banc 2012). "The trial judge has absolute discretion as to the credibility of witnesses and the weight of their testimony is a matter for the trial court, and its findings on witness credibility are never reviewable by the appellate court." *Blair v. Blair*, 147 S.W.3d 882, 886 (Mo. App. 2004) (internal quotation marks and citation omitted).

11

## Point I – Validity of Settlement Agreements

Pfeiffer argues in her first point on appeal that the circuit court misapplied the law in finding the parties entered into two valid and enforceable settlement agreements, arguing that the settlement agreements were missing a material term – the purchase price – rendering the agreements invalid and unenforceable as contracts for the sale of real estate. Pfeiffer argues that the agreements in this case "lack sufficient detail as to the price and the promises on both sides to rise to the level of enforceable contracts for the sale of real estate." Pfeiffer contends that, while contracts which contain a method for determining a certain purchase price in the future can be enforceable, the future price to be determined in this case lacked a method that consisted of "the definiteness needed to amount to being certain." Pfeiffer suggests that basing the price on a fair market valuation or an assessed valuation would have made the contract sufficiently definite, but that it was impossible in this case for the parties to have known or measured the extent of their respective liabilities at the time the agreements were signed. Further, the parties had no idea who the buyer or seller would be.

At trial, Pfeiffer's attorney, who drafted the agreements and represented Pfeiffer at the time of the agreements, testified that a January 24, 2022, email was sent to opposing counsel on Pfeiffer's behalf establishing the sale price of the Kearney property pursuant to the Clay Agreement. Further, that a January 25, 2022, email was received by Pfeiffer's attorney from opposing counsel pursuant to the Sullivan Agreement which established the sale price of the Sullivan County property.

12

Kristi testified that the purchase price of, and Kristi's desire to purchase, the Kearney property was exchanged with Pfeiffer pursuant to the Clay Agreement, as was the purchase price of, and the Browns' desire to purchase, the Sullivan County property pursuant to the Sullivan Agreement.

In Answer to the Browns' Second-Amended Petition, Pfeiffer admitted that she entered into both the Clay Agreement and the Sullivan Agreement. She additionally admitted that, under the terms of the Clay Agreement, Pfeiffer agreed to state a price for one-half of which (less one-half of title insurance costs) she would be willing to either buy Kristi's one-half interest in the property, or sell her own one-half interest to Kristi. Pfeiffer additionally admitted that, under the Sullivan Agreement, she agreed that Brown would state a price for one-half of which (less one-half of title insurance costs) Brown would be willing to either buy Pfeiffer's one-half interest in the Sullivan County property, or sell their own one-half interest to Pfeiffer.

Pfeiffer testified at trial that she was a licensed Missouri real estate sales person. Pfeiffer admitted to not closing on the Kearney property, stating that she would have closed on the property on the scheduled day but was unwilling to release the Browns from further judgments from unpaid bills and unpaid mechanics liens on the property. Pfeiffer acknowledged, however, that both agreements contained a provision that various issues remained to be litigated and that Pfeiffer was not waiving those. Issues expressly not waived included expenses incurred on behalf of Pfeiffer's and Kristi's mother and/or property expenses, including various bills, taxes, etc. Pfeiffer also admitted to never

13

closing on the sale of the Sullivan County property. While Pfeiffer testified that the agreements stated no purchase price for the properties, she never testified that there was not a clear method for determining the sale price set forth in the agreements, or that she misunderstood the agreements or the pricing method to which she agreed.

Real estate contracts in Missouri require specific terms to be enforceable for the sale of real property, with the essential elements of an agreement to convey real property to include: (1) the parties; (2) the subject matter; (3) promises on both sides; (4) stipulation of a price, or a method of determining it; and (5) consideration. *Ebert v. Ebert*, 627 S.W.3d 571, 587 (Mo. App. 2021). "It is fundamental that in order to be binding, an agreement for the sale of land must be definite and certain as to its terms and requirements to enable a court to determine its meaning and to measure the extent of the parties' liability." *Id.* (internal quotation marks and citation omitted). "Real estate contracts are subject to the extraordinary remedy of specific performance because they convey a unique interest in a particular tract of land, thus their essential terms should be so precise and exact that neither party could reasonably misunderstand them." *Id.* (internal quotation marks and citation omitted).

We find the record clear that in settling the matter the parties expressly chose their own unique method of valuation in lieu of more traditional methods. The settlement agreements were reached nearly a year after the Browns filed suit to partition the properties. In requesting partition, the Browns asked the court to order an appraisal of the Kearney property to determine the fair market value prior to ordering a sale. The

14

Browns requested that the Sullivan County property be advertised and sold by the Sheriff on the courthouse steps.  In answer, Pfeiffer alleged that the relief sought by the Browns was barred, in part, due to the Browns' failure to comply with Missouri's Save the Family Farm Act.  Missouri's Save the Family Farm Act discusses valuing property via a certified appraisal to determine fair market value.  § 528.720.1.[3]  With regard to heirs' property, the Act provides that, if all cotenants have agreed to the value of the property or another method of valuation, the court shall adopt that value or the value produced by the agreed method of valuation.  § 528.720.2.

In settling the Brown's request for partition, the parties expressed a "desire to terminate their co-tenancy and to make provision for one of them to buy out the other."  The parties knew, therefore, that instead of an unknown individual purchasing the properties in a court ordered sale, one of the two parties would purchase one or both properties.  One of the two parties would sell one or both properties.  The parties acknowledged that, except for issues still remaining which were expressly identified in the agreements, the parties were making a "full and final settlement of their dispute as to" the properties.  Pfeiffer now challenges the method created by the parties to effectuate the parties' expressed intent to "make provision for one of them to buy out the other," suggesting that basing the buy/sell price on a fair market/assessed valuation would have made the contracts sufficiently definite.  Yet, the pleadings of both Brown and Pfeiffer

---

[3] All statutory references are to the Revised Statutes of Missouri, as updated through August 2020, unless otherwise noted.

show that they were well aware of alternative methods but opted to agree to a different method, presumably more suited to reaching their settlement goals.

Pfeiffer, a Missouri licensed real estate agent who testified that she had participated in over a thousand real estate contracts, agreed to place a price on the Kearney property. Kristi agreed to accept Pfeiffer's valuation and either buy the property from Pfeiffer for half of that price, or accept half of that price as payment for her own interest in the property. Pfeiffer set a price of $100,000 pursuant to the Clay Agreement, and Kristi agreed to "buy out" Pfeiffer for half of that price. Pursuant to the terms of both agreements and the performance dates set forth therein, all decisions regarding the Kearney property were to be made before any party was obligated to act regarding the Sullivan County property.

In the Sullivan Agreement, the parties agreed that the Browns would place a price on the Sullivan County property. Pfeiffer agreed to accept the Browns' valuation and either buy it from the Browns for half of that price, or accept half of that price as payment for her own interest in the property.

We find the method for determining the purchase price of the properties in the two agreements sufficiently definite so as to have created binding and enforceable contracts. Pfeiffer is the only party now asserting that the method for pricing the property was too indefinite, but the fact that Pfeiffer herself valued the Kearney property pursuant to the Clay Agreement evidences that she understood the method for valuation to which she agreed. Pfeiffer even testified that she would have closed on that sale if she had not had

16

concerns that the closing would allow the Browns to escape responsibility for various expenses incurred by Pfeiffer related to the property. She never testified that she misunderstood the pricing terms.

The same method for valuation was used in the Sullivan Agreement. Pfeiffer never claimed that the price quoted by the Browns for the Sullivan property resulted from unconscionable contract terms (which would have been a difficult argument given that her attorney drafted the agreement) and/or resulted in unfair surprise. Nor, although contending on appeal that fair market value would have been an acceptable pricing method, did she ever contend that the Browns' stated price for the Sullivan property was unreasonable or unexpected compared to a fair market valuation.[4]

The circuit court did not misapply the law in finding the parties entered into two valid and enforceable agreements, as the settlement agreements contained a sufficiently definite method of determining the sale price of the properties.

---

[4] At the time Pfeiffer breached the agreements, a price had already been established for both properties. Even if it could be said that the agreements did not sufficiently set forth a method for determining price, at the time of Pfeiffer's breach, the agreements were similar to lease provisions containing a "preference" or "first refusal" option clause in the event leased land is sold, with such option leaving price to the future agreement of the parties. *Barling v. Horn*, 296 S.W.2d 94, 97 (Mo. 1956). "With regard to the contention or objection that such a clause is void under the Statute of Frauds and unenforceable because of vagueness…such objection is met when the optioner fixes a price at which he is willing to sell." *Id.* (Internal quotation marks and citation omitted). "The option, if adequate in other respects, thereupon becomes a definite offer, which, when accepted by the optionee, ripens into a mutually binding contract, specifically enforceable." *Id.* (Internal quotation marks and citation omitted). Pfeiffer fixed the price of the Kearney property pursuant to the Clay Agreement and Kristi accepted that price. The Browns fixed the price of the Sullivan County property under the Sullivan Agreement and the only thing left for Pfeiffer to do was make her buy/sell selection.

17

Pfeiffer's first point on appeal is denied.

## Point II – Fair Rental Value

Pfeiffer contends in her second point on appeal that the circuit court erred in finding the reasonable fair rental value of the Kearney property to be $1,600.00 per month, arguing that this ruling is not supported by substantial evidence in that Kristi failed to present competent evidence of the fair rental value at trial. Pfeiffer argues that the sole evidence as to the fair rental value of the Kearney property was testimony of an inexperienced real estate agent who lacked proper foundational knowledge to provide a valid opinion on this particular property as of the date such property was inherited by the parties.

Kristi pled in Count I of the Second Amended Petition that she was entitled to $800.00 per month during the time Pfeiffer exclusively occupied the Kearney property and prevented Kristi from entering the house, which represented one half of the fair rental value of the house. Pfeiffer, therefore, was on notice prior to trial that Kristi was claiming the monthly fair rental value of the Kearney property to be $1,600.00.

At trial, M.M. testified to being a real estate agent for three and a half years for "north-of-the-river properties," including Kearney, Missouri. M.M. handled the sale of real estate and M.M.'s investors handled leases on real estate. M.M. testified that M.M. always had to be knowledgeable as to the rental rates of homes so that investors would know if a property was worth investing in. M.M. subscribed to the professional version of "Rentometer," which is a website that pulls all public rental properties in the exact area

18

searched and within a certain distance. M.M. testified that this was the best option M.M. had seen for calculating rental value of a residential home. M.M. personally viewed the Kearney property once. The home is 2,616 square feet based on tax records.

M.M. testified that the fair market rental value of the Kearney property on August 20, 2020, was $1,692.00 per month. August 20, 2020, was when the property was transferred to Pfeiffer and Kristi. M.M. found the fair market rental value of the property on August 5, 2022 to be $2,116.00 per month, however this was based on a 20% under market valuation for the home being outdated. August 5, 2022, was the date Kristi finally closed on purchasing the home.

As owner of the property, Kristi testified that she believed the fair rental value of the property to be $1,600.00 per month on August 20, 2020. "The general rule in Missouri is than an owner is presumed competent to testify to the value of his real property even though he does not qualify as an expert." *Sharaga v. Auto Owners Mut. Ins. Co.*, 831 S.W.2d 248, 252 (Mo. App. 1992). Pfeiffer did not cross examine Kristi regarding this opinion, or introduce any competing evidence on this issue. Despite Pfeiffer being half-owner of the home and a licensed Missouri real estate sales person, Pfeiffer offered no personal opinion as to the fair rental value of the home.

The circuit court's ruling, that the reasonable fair rental value of the Kearney property was $1,600.00 per month, is supported by substantial evidence.

Pfeiffer's second point on appeal is denied.

19

## Conclusion

We affirm the circuit court's judgment, and remand for a determination of appellate attorneys' fees.[5]

_____
Anthony Rex Gabbert, Judge

All concur.

---

[5] The Browns filed a motion for attorneys' fees incurred in defending this appeal. This motion is granted. Both the Clay Agreement and the Sullivan Agreement contain attorney fee provisions for the prevailing party in the event of a contract dispute. "[W]hile appellate courts have the authority to award attorney fees on appeal, because the trial court is better equipped to hear evidence and determine the reasonableness of the fee requested, we remand to the trial court to determine a reasonable award of attorneys' fees on appeal." *Gray v. Missouri Dept. of Corrections*, 635 S.W.3d 99, 108 (Mo. App. 2021).